STATE OF CONNECTICUT *v.* JUAN
FERNANDO RAMIREZ
(AC 22582)

Lavery, C. J., and Schaller and West, Js.

Argued January 16—officially released September 23, 2003

*John R. Gulash, Jr.,* for the appellant (defendant).

*James A. Killen,* senior assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan,*

state's attorney, and *Anthony Bochicchio*, assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Juan Fernando Ramirez, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1).[1] On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress certain evidence found during an unlawful search by police, and (2) precluded him from questioning witnesses regarding the victim's postassault conduct in violation of his constitutional rights to confrontation and to present a defense. We agree with the defendant's second claim and, accordingly, reverse the judgment of the trial court. Although that claim is dispositive of the defendant's appeal, we also address his first claim because it is likely to arise in the new trial. See *State* v. *Davis*, 261 Conn. 553, 556, 804 A.2d 781 (2002).

The jury reasonably could have found the following facts. On June 25, 1999, the victim and her then boyfriend Johnny Ramirez, who is the defendant's brother, attended a party at the home of the defendant's parents. After consuming several drinks, the victim became ill. The defendant offered to escort the victim to the bathroom. When they reached the bathroom, the defendant remained with the victim while she vomited. The defendant then told the victim that she looked "sexy" and "pretty" and began to fondle her breasts. She begged him to stop and then vomited again. The defendant then proceeded to force the victim to engage in sexual

---

[1] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

intercourse, penetrating her vagina with his fingers, mouth and penis. The victim repeatedly implored the defendant to stop, but did not have the strength to physically restrain him.

The next morning, the victim awoke alone in a bed in the defendant's parents' home. When she awoke, she found that her clothing was in disarray. She ate breakfast with the defendant's family. At that time, she was not entirely certain what had transpired the previous night and who had been involved, so she did not say anything to anybody about the incident in the bathroom. Later, the defendant drove the victim and Johnny Ramirez to Johnny Ramirez's apartment. At that time, the victim was still confused about the events of the previous night. Johnny Ramirez later took the victim to her parents' home where she lived. She did not tell her parents that evening what had transpired the previous night.

The next morning, the victim went to work. While she was at work, she realized she had been raped, but was not certain of the identity of her assailant. Later in the day, however, she became more confident that the defendant had raped her. She returned home, where she told her mother about the assault and called the police. They then went to the hospital, where she was examined and rape kit tests were performed.

The defendant was later arrested in New York and taken to a correctional facility in that state. The authorities in New York subsequently delivered him into the custody of the Danbury police department. He was charged with sexual assault in the first degree and, after a six day trial, the jury returned a verdict of guilty. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied his motion to suppress certain evidence found

during an unlawful search by police. Specifically, the defendant argues that a certain letter that was admitted into evidence at trial was obtained by way of an illegal search in violation of the fourth and fourteenth amendments to the United States constitution.[2] We are not persuaded.

The following facts, found by the court in connection with the defendant's motion to suppress, are relevant to that issue. The defendant was arrested and held at the Putnam County correctional facility in Carmel, New York, as a fugitive from justice in connection with this case. Joseph LeRose and James Pacific, who were officers with the Danbury police department, traveled to that facility to arrest the defendant pursuant to a warrant. At the time that the officers took custody of the defendant, the correctional facility authorities gave them a bag containing the defendant's personal property and an inventory sheet listing the property. LeRose checked the contents of the bag and determined that they matched the items listed on the inventory sheet. The officers placed the bag in the trunk of their police cruiser and drove the defendant directly to the Danbury police department.

Upon arriving at the Danbury police department, LeRose processed the defendant by taking his fingerprints and photograph, conducting a patdown search and providing him with an opportunity to make a telephone

[2] The defendant also claims that the letter was obtained in violation of article first, §§ 7 and 8, of the constitution of Connecticut. "Because the defendant has not briefed his claim separately under the Connecticut constitution, we limit our review to the United States constitution. We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 69 Conn. App. 649, 656 n.6, 796 A.2d 1225, cert. denied, 260 Conn. 937, 802 A.2d 91 (2002).

call. Pursuant to Danbury police department policy, LeRose also performed an inventory search of the defendant's personal belongings, including the items in the bag that the correctional facility authorities in New York had given to the officers. The purpose of the search was to determine whether the bag contained any contraband or dangerous instruments.

While performing the inventory search, LeRose noticed an unsealed envelope containing multiple pages of a letter or letters. He opened the envelope and removed the pages one by one to be sure that there was no contraband, such as illegal drugs, hidden in the envelope. Initially, LeRose did not read the writing on the pages. When he notice the word "Important" written in the margin of one of the pages, however, he read the nearby text, in which the defendant asked someone named Ed to offer "that girl" $2000 to drop the charges against the defendant. Upon further review of the document, LeRose discovered a statement that "Ed" could solve the defendant's problem "by talking to that girl . . . . I have $2000 you can offer it to her if she drops the charges."

The defendant filed a motion to suppress the letter on the ground that it was obtained through an unlawful search in violation of the fourth and fourteenth amendments. The state made three arguments in opposition to the motion to suppress. Specifically, the state argued that the use of the letter would not violate the defendant's constitutional rights because (1) there was no search within the meaning of the fourth amendment, as the defendant did not have a reasonable expectation of privacy with regard to the letter, (2) the letter was obtained by way of a search incident to a lawful arrest and (3) the letter was in plain view during a lawful inventory search. The court agreed with the state's second and third arguments and, accordingly, denied the defendant's motion to suppress. The court did not

address the state's argument that the defendant had no reasonable expectation of privacy with regard to the letter. At trial, the court admitted the letter into evidence.

On appeal, the defendant argues that the court improperly determined that the letter was obtained by way of a search incident to a lawful arrest and pursuant to a lawful inventory search. We conclude that the court properly denied the motion to suppress, but base our conclusion on the alternate ground that the defendant did not have a reasonable expectation of privacy with regard to the letter and that the review of the letter by police therefore did not constitute a search within the meaning of the fourth amendment.

"Our review of the defendant's claim is governed by well established principles. Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citations omitted; internal quotation

marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 42–43, 836 A.2d 224 (2003).

"[T]o claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." (Internal quotation marks omitted.) *Minnesota* v. *Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998). "To receive fourth amendment protection against unreasonable searches and seizures, a defendant must have a legitimate expectation of privacy in the [subject of the search]. . . . Absent such an expectation, the subsequent police action has no constitutional ramifications." (Internal quotation marks omitted.) *State* v. *Russo*, 259 Conn. 436, 441 n.7, 790 A.2d 1132, cert. denied, 537 U.S. 879, 123 S. Ct. 79, 154 L. Ed. 2d 134 (2002). "The determination of whether such an expectation exists is to be made on a case by case basis . . . and requires a two-part inquiry: first, whether the individual has exhibited an actual subjective expectation of privacy, and second, whether that expectation is one society recognizes as reasonable. . . . Whether a defendant's actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Mooney*, 218 Conn. 85, 94, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

The second element of the "reasonable expectation of privacy" test is dispositive of the issue in the present case because the facts found by the court establish as a matter of law that the defendant's subjective expectation of privacy, if any, was not reasonable. Our conclu-

sion is based on *Hudson* v. *Palmer*, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984), in which the United States Supreme Court specifically held "that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." Id., 526.

The *Hudson* court elaborated on its rationale as follows: "[P]risons are not beyond the reach of the Constitution. No iron curtain separates one from the other. . . . Indeed, we have insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration. . . . However, while persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights. . . . These constraints on inmates, and in some cases the complete withdrawal of certain rights, are justified by the considerations underlying our penal system. . . . The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities . . . . chief among which is internal security . . . ." (Citations omitted; internal quotation marks omitted.) Id., 523–24.

"[P]rison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and

other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize. In addition to these monumental tasks, it is incumbent upon these officials at the same time to maintain as sanitary an environment for the inmates as feasible, given the difficulties of the circumstances. . . . [I]t would be literally impossible to accomplish the prison objectives identified above if inmates retained a right of privacy in their cells." (Citations omitted.) Id., 526–27.

"Determining whether an expectation of privacy is legitimate or reasonable necessarily entails a balancing of interests. The two interests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell. The latter interest, of course, is already limited by the exigencies of the circumstances: A prison shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. . . . We strike the balance in favor of institutional security, which . . . is central to all other corrections goals . . . . A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that [l]oss of freedom of choice and privacy are inherent incidents of confinement." (Citations omitted; internal quotation marks omitted.) Id., 527–28. Furthermore, the principle underlying the holding in *Hudson*, that is, that the fact of confinement and the legitimate goals and policies of

the penal institution limit the constitutional rights of prisoners, "applies equally to pretrial detainees and convicted prisoners. A detainee simply does not possess the full range of freedoms of an unincarcerated individual." *Bell* v. *Wolfish*, 441 U.S. 520, 546, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).

In the present case, the defendant does not dispute the fact that the letter in question was written while he was incarcerated at the correctional facility in New York and that the correction officers there removed it from his cell along with his other property. As the previously cited legal authorities indicate, any subjective expectation of privacy that the defendant had with regard to the items within his prison cell was not reasonable. Accordingly, the correction officers at the New York facility did not conduct a search or seizure within the meaning of the fourth amendment when they took the letter from the defendant's cell. The defendant did not have a reasonable expectation of privacy with regard to the letter when the prison authorities removed it from his cell, and the actions of the prison authorities therefore had no constitutional ramifications.

That conclusion, however, does not end our inquiry. The question before the court in the present case was whether the Danbury police officers' subsequent act of reading the letter at the Danbury police station violated the fourth amendment. Because we have already established that the defendant did not have any reasonable expectation of privacy with regard to the letter when it was in his jail cell, the Danbury police officers' act of reading the letter likewise does not have any constitutional ramifications unless something in the circumstances arising subsequent to the initial seizure of the letter was sufficient to create such an expectation. Nothing happened, however, between the moment that the New York authorities initially took the letter from the defendant's cell and the moment that the Danbury

police read the letter that would give the defendant a reasonable expectation of privacy with regard to the letter. There was no evidence that the letter was ever outside the control of the New York authorities before they handed it over to the Danbury police. From that point forward, the letter was within the exclusive control of the Danbury police. The defendant could not have had any reasonable expectation of privacy with regard to property in police custody that had been recovered from a location in which he had no such reasonable expectation in the first place.[3]

The facts found by the court establish that the defendant did not at any time have a reasonable expectation of privacy with regard to the letter he wrote while incarcerated. Consequently, the defendant failed to carry his burden of demonstrating that the fourth amendment was implicated by the Danbury police officers' reading of the letter. Accordingly, we conclude that the court properly denied the defendant's motion to suppress.

II

The defendant claims that the court improperly precluded him from questioning witnesses regarding the victim's postassault conduct in violation of his constitutional rights to confrontation and to present a defense. Specifically, the defendant argues that after the state elicited testimony from the victim that she took a

---

[3] Our conclusion is not inconsistent with our Supreme Court's holding in *State* v. *Joyce*, 229 Conn. 10, 21, 639 A.2d 1007 (1994), that mere custody of the defendant's property does not entitle the police to search the property. In *Joyce*, the police searched clothing that had been removed from the defendant's body by emergency medical workers. Id., 12–15. The court held that the defendant did not lose the reasonable expectation of privacy he initially had in his clothing merely because the police took custody of the clothing. Id., 21. In the present case, by contrast, the defendant never had a reasonable expectation of privacy with regard to the letter he wrote while incarcerated.

shower the day after she was sexually assaulted, he should have been permitted to ask both the victim and Johnny Ramirez whether they had showered together. The state argues that the questions were precluded properly because they sought to elicit evidence of sexual conduct in violation of the rape shield statute, General Statutes § 54-86f.[4] We agree with the defendant.

The following additional facts are relevant to the defendant's claim. At trial, the defendant admitted to having sexual intercourse with the victim. The defendant's theory of defense at trial was that the victim had consented. Specifically, the defendant argued that the victim consented to sexual intercourse and subsequently regretted her decision. Thus, as both the state and the defendant stated during their respective closing arguments, the main issue for the jury to determine was whose version of events to believe—the defendant's or the victim's.

During direct examination by the state, the victim described the events of the day following the sexual assault. She stated that when she awoke the morning after the assault, she stood up and felt something dripping down her leg. She testified that the substance appeared to be semen and that "it was coming from inside of [her]." She further testified that after she and

---

[4] General Statutes § 54-86f provides in relevant part: "In any prosecution for sexual assault under sections 53a-70, 53a-70a, and 53a-71 to 53a-73a, inclusive, no evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. . . ."

Johnny Ramirez arrived at his apartment, she took a shower and got dressed.[5]

Prior to beginning cross-examination of the victim and outside the presence of the jury, the defendant sought the court's permission to ask the victim whether she and Johnny Ramirez had showered together at the apartment that day. The defendant argued that the question was relevant to the jury's determination of whether the victim's behavior was consistent with the conduct of a victim of a recent sexual assault. The court ruled that the evidence sought by the proposed question was irrelevant and therefore disallowed the question.

The defendant subsequently called Johnny Ramirez as a witness and sought the court's permission to ask him questions regarding the shower. The court permitted the defendant to make an offer of proof by examining Johnny Ramirez outside of the jury's presence. In response to the defendant's questions, Johnny Ramirez indicated that he and the victim had showered together at his apartment on the day after the sexual assault.[6]

---

[5] The victim testified as follows:

"[The Prosecutor]: What did you do when you got to Johnny's?

"[The Witness]: I took a shower.

"[The Prosecutor]: And what did you do next?

"[The Witness]: Got dressed.

"[The Prosecutor]: And how were you feeling at that point?

"[The Witness]: A little bit better; still very sick and confused and unclear as to what exactly had happened.

"[The Prosecutor]: And how long did you stay at Johnny's?

"[The Witness]: A couple of hours, maybe."

[6] Johnny Ramirez testified as follows:

"[Defense Counsel]: Mr. Ramirez, when you got back to your apartment . . . you were accompanied by [the victim], is that correct?

"[The Witness]: Yes.

"[Defense Counsel]: When you went in your apartment, what did you— what did you do?

"[The Witness]: We went into my apartment, and we both took a shower together. Then we went to bed together.

"[Defense Counsel]: Okay. How did you spend the rest of the afternoon?

"[The Witness]: We watched TV maybe for about another hour or so. Then I took her home."

The defendant again argued that the evidence was relevant to the question of whether the victim's actions were consistent with the conduct of a victim of a sexual assault. The court disallowed the testimony on the grounds that it constituted extrinsic evidence on a collateral issue and that, pursuant to § 54-86f, it was inadmissible evidence of the sexual conduct of the victim.[7]

[7] Although the court did not explicitly cite to General Statutes § 54-86f in ruling that the proffered testimony was inadmissible, it is clear from the transcript that the court based its ruling on what it saw as the sexual nature of the testimony. Specifically, the following colloquy took place regarding the court's ruling:

"The Court: I'm not going to allow any testimony about sexual activity. What I heard was that they went to the witness' home and they went to sleep. And—But I'm not going to allow any evidence or any testimony about taking a shower. But you had asked this witness about describing the day and, to that extent, the objection is overruled.

"[Defense Counsel]: I don't want to offend the court. Will I be allowed to ask: 'Did you, in fact, take a nap?' He can say yes or no.

"The Court: 'Did you—' He can—yes, you may ask that.

"[Defense Counsel]: Okay. I can't ask him if they went to—went to bed together?

"The Court: Went to bed?

"[Defense Counsel]: I just want to be clear, Your Honor. I'm not going to trample on your rulings.

"The Court: Well, that term, 'went to bed together,' is ambiguous. Strictly speaking, I suppose you can get into bed with somebody and never have sexual intercourse or any type of sexual contact.

"[Defense Counsel]: Well, apparently, that's the position of the—

"The Court: But it's a colloquial phrase, which everyone understands means having sex—having some type of sexual activity. Do you want to ask him if they went and they took a nap or they went to sleep? I'll allow that. But I won't allow any questions about sexual activity or taking a shower together. Or you can ask about what else they did during the day.

\* \* \*

"The Witness: So, what you're saying is that I basically can't say that anything happened when we were in my apartment. I mean, that's—

"The Court: No, that's not what I said. I said I'm not going to allow any testimony about any sexual activity between you and [the victim] or any testimony about you and [the victim] taking a shower together. You understand that?

"The Witness: Well, I mean, that's not—

"The Court: Do you—My question is do you understand it?

"The Witness: Not clearly.

"The Court: I'm not going to allow you to sit there and say that you and

"Upon review of a trial court's decision, we will set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . The trial court has wide discretion in determining the relevancy of evidence and the scope of cross-examination and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . To establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial. . . .

"Although the outright denial of a defendant's opportunity to cross-examine a witness on an element of the charged offense implicates the constitutional protection of the confrontation clause, such a denial is [still] subject to harmless error analysis . . . [which will result in a new trial] only if the exclusion of the proffered evidence is not harmless beyond a reasonable doubt. . . .

"Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Citations omitted; internal

[the victim] took a shower together or that you and [the victim] had sexual intercourse together or engaged in some sexual activity together. Do you understand what I just said?

"The Witness: Yes."

quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 173–74, 777 A.2d 604 (2001).

"The [sixth amendment to the] federal constitution [also] require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment right to compulsory process includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . The defendant's sixth amendment right, however, does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, an accused must comply with established rules of procedure and evidence in exercising his right to present a defense. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." (Internal quotation marks omitted.) *State* v. *Abernathy*, 72 Conn. App. 831, 838, 806 A.2d 1139, cert. denied, 262 Conn. 924, 814 A.2d 379 (2002). As with the exclusion of evidence in violation of the defendant's right of confrontation, the exclusion of evidence in violation of the defendant's right to present a defense is subject to a harmlessness analysis. *State* v. *Smith*, 73 Conn. App. 173, 196, 807 A.2d 500, cert. denied, 262 Conn. 923, 812 A.2d 865 (2002). In both cases, the state must demonstrate harmlessness beyond a reasonable doubt. *State* v. *Ramos*, 261 Conn. 156, 176, 801 A.2d 788 (2002).

The state characterizes the testimony offered in the present case as evidence of "sexual conduct" as that term is used in § 54-86f. We note that the defendant sought to introduce evidence indicating that the victim and Johnny Ramirez showered together, and did not seek to elicit testimony about any specific sexual activi-

ties that may have taken place in the shower or even whether sexual activity did in fact occur. The state's argument that § 54-86f applies to the proffered evidence raises the question of when, if ever, evidence merely *suggesting* sexual conduct might implicate that statute. Nevertheless, we need not address that issue today because we conclude that the exclusion of the proffered evidence violated the defendant's constitutional rights regardless of whether it constituted "evidence of sexual conduct" within the meaning of § 54-86f.

"[I]n cases involving sexual crimes, [t]he rape shield statute . . . was enacted specifically to bar or limit the use of . . . sexual conduct of an alleged victim of a sexual assault because it is such highly prejudicial material. . . . However, [a]lthough the state's interests in limiting the admissibility of this type of evidence are substantial, they cannot by themselves outweigh the defendant's competing constitutional interests. . . .

"We must remember that [t]he determination of whether the state's interests in excluding evidence must yield to those interests of the defendant is determined by the facts and circumstances of the particular case. . . . In every criminal case, the defendant has an important interest in being permitted to introduce evidence relevant to his defense. Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . Whenever the rape shield statute's preclusion of prior sexual conduct is invoked, a question of relevancy arises. If the evidence is probative, the statute's protection yields to constitutional rights that assure a full and fair defense. . . . If the defendant's offer of proof is sufficient to show relevancy, and that the evidence is more probative to the defense than prejudicial to the victim, it must be deemed admissible at trial." (Citations omitted; internal

quotation marks omitted.) *State* v. *Rolon,* supra, 257 Conn. 176–77; see also General Statutes § 54-86f (4) (evidence of victim's sexual conduct admissible if so relevant and material to critical issue in case that exclusion would violate defendant's constitutional rights).

In the present case, we conclude that the court's rulings precluding the defendant from questioning the victim and Johnny Ramirez regarding whether they had showered together the day after the assault violated his rights to confrontation and to present a defense. As stated, the victim testified that the morning after the assault, she found what appeared to be semen dripping down her leg and that she subsequently left the house where the assault had occurred, went to Johnny Ramirez's apartment and took a shower. No other evidence regarding the shower was presented. The jury was likely to conclude from the evidence presented that the victim showered alone as soon as reasonably possible after the attack because she wanted, in the defendant's words, "to remove the taint of nonconsensual sexual activity." We are convinced that the defendant's version of the shower, that is, that the victim showered with the defendant's brother less than one day after allegedly being sexually assaulted by the defendant, might have painted a decidedly different picture in the minds of the jurors. The proffered testimony would have been probative of the defendant's theory of defense because the jury might have concluded, on the basis of that evidence, that the victim's conduct was inconsistent with the conduct of a sexual assault victim. Moreover, the admission of the evidence would not have been highly prejudicial with regard to the victim in view of the defendant's efforts to avoid eliciting any explicitly sexual details of the shower. Because the probative value of the proffered evidence outweighed the potential prejudice to the victim, the defendant had a constitutional right to have the evidence admitted,

notwithstanding the purpose of the rape shield statute. See *State* v. *Rolon,* supra, 257 Conn. 177.

We next must determine whether the exclusion of the evidence was harmless beyond a reasonable doubt. See *State* v. *Ramos,* supra, 261 Conn. 176. The victim's testimony that she took a shower was important to the prosecution's case because, as stated, it suggested behavior consistent with the conduct of a victim of a recent sexual assault while the proffered testimony would have suggested behavior that the jury might have considered inconsistent with such an assault. The prosecution's case was not an especially strong one, as it turned almost exclusively on whether the jury believed the victim's or the defendant's version of events; there were no other firsthand witnesses who could testify about the issue of force. Furthermore, the proffered testimony would not have been cumulative because there was no other evidence as to whether the victim showered alone or with Johnny Ramirez on the day after the assault. On the basis of all of those factors, we cannot say that the exclusion of the proffered evidence did not have a tendency to influence the judgment of the jury. The state has not demonstrated that the exclusion of the evidence was harmless beyond a reasonable doubt.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.