STATE OF CONNECTICUT *v.* MAURICE WEAVER
(AC 23774)

Foti, Schaller and Peters, Js.

Argued June 4—officially released October 5, 2004

*Jeanne M. Zulick*, special public defender, for the appellant (defendant).

*Bruce R. Lockwood*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Terence D. Mariani*, assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Maurice Weaver, appeals from the judgments of conviction, rendered following a jury trial, under docket number CR01-302091, of burglary in the first degree, attempt to commit robbery in the first degree and conspiracy to commit robbery in the first degree and, under docket number CR01-302092, of two counts of burglary in the first degree and one count of attempt to commit robbery in the first degree. On appeal, the defendant claims that (1) the trial court should have suppressed certain evidence obtained following the defendant's allegedly unlawful arrest, (2) certain of the charges of which he was convicted were not supported by the evidence, and (3) his rights to due process and confrontation were violated as a result of the state's loss of certain evidence. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. At or around 5 p.m. on July 16, 2001, Walford Campbell and Nicole Johnson were watching television in Campbell's Waterbury condominium. Upon hearing a knock at the door, Campbell went to the door and opened it to see who was there. The defendant and Henry Echols forced their way into the condominium. Campbell and the defendant, who was armed with a gun, struggled briefly. The defendant went to Johnson

and dragged her to an upstairs bedroom. Echols struck Campbell in the head with his gun when Campbell tried to protect Johnson.

Shortly thereafter, Echols brought Campbell upstairs to join the defendant and Johnson. The defendant asked Campbell and Johnson where they kept their money, and began pulling apart bedding in a search for money. The defendant then asked for the keys to a Lexus automobile. Campbell informed the defendant that he did not own a Lexus, but that his neighbor did. The defendant then addressed Echols, stating, "[W]e got the wrong house, we got the wrong house." The defendant asked Campbell and Johnson not to notify the police, and stated that he and Echols were going to leave. As the defendant and Echols left Campbell's condominium, they pulled the telephone jacks from the wall.

The defendant and Echols next entered the condominium of Thomas Palmieri, Campbell's neighbor. Palmieri was watching television with Mark Sherman, Anton Cross and Kenny Schofield when the defendant and Echols appeared in his condominium armed with guns. Echols was wearing a mask. The defendant, in an excited tone, asked, "Where is your money?" Sherman spoke with one of the intruders in the kitchen while the other intruder stood by a stairway to prevent anyone from leaving. Shortly thereafter, the defendant and Echols left Palmieri's condominium.

After the defendant and Echols had left Campbell's condominium, Campbell and Johnson drove to the Waterbury police department, where they reported the incident to Officers Richard Innaimo and Jason Davino. Innaimo and Davino accompanied Campbell and Johnson back to the condominium complex and investigated the crime scene. At that time, Innaimo and Davino encountered Palmieri, who reported the incident that had occurred in his unit. Palmieri accompanied the

officers to the police department to assist in the investigation. The police arrested the defendant shortly thereafter. This appeal followed the defendant's conviction.

I

The defendant first claims that the court should have suppressed (1) evidence of Palmieri's identification of him and (2) his confession concerning his invasion of Campbell's residence because this evidence was obtained by the police following an unlawful arrest. We disagree.

At trial, Innaimo testified that, upon arriving at Campbell's condominium complex, he and Davino encountered Palmieri. Palmieri related to the officers what had occurred in his unit and told the officers that the defendant, to whom he referred by name, was one of the intruders. Innaimo obtained the defendant's address from police headquarters, and he and Davino immediately went to the defendant's residence. Upon finding the defendant at the residence, Innaimo and Davino took custody of him and put him in the back of their police cruiser. The officers brought the defendant to the front gate of his apartment complex, where Palmieri, who was with a detective in an unmarked police vehicle, positively identified the defendant.

The state also elicited evidence from John Kennelly, a detective with the Waterbury police department. Kennelly testified that, on July 17, 2001, following the defendant's arrest, he and another detective interviewed the defendant at police headquarters. Kennelly testified that, after advising the defendant of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), he questioned the defendant, who related to him that he and Echols had forced their way into an apartment the day before. The defendant recalled that Echols had hit a man in the apartment with his gun, and that he himself had found a female

victim upstairs in the apartment. The defendant further recalled that, when the male victim informed both him and Echols that the Lexus parked outside belonged to his neighbor, they realized that they were in the wrong apartment. The defendant told Kennelly that he and Echols left that apartment and went to the neighbor's apartment, but he would not relate any details of what occurred therein.

The defendant argues that the police illegally seized him in violation of rights afforded to him under the fourth and fourteenth amendments to the United States constitution.[1] The defendant argues that the court should have suppressed evidence of Palmieri's identification of him and of the confession, which, he argues, was "gleaned from that illegal detention." The defendant did not raise this issue precisely at trial and now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The court's resolution of other claims raised at trial affords us an adequate record for review. At trial, the defendant filed a motion to dismiss the informations filed under both docket numbers on the grounds that a warrant had not been issued for his arrest and that he had been arrested without probable cause. The defendant also filed a motion to suppress "all of his alleged statements . . . concerning this case" because he did not give such statements voluntarily and they were taken in contravention of his *Miranda* rights. The court denied both of those motions. The defendant's claim is of constitutional magnitude, but fails under *Golding*'s third prong because the defendant has failed to demonstrate that a constitu-

---

[1] The defendant also argues that the illegal search violated rights afforded him under article first, §§ 7, 8 and 9, of the constitution of Connecticut. Despite referring to those provisions in his appellate brief, the defendant has not provided us with an independent analysis of his claim under the Connecticut constitution. Accordingly, we will limit our review to his claim under the federal constitution. See, e.g., *State* v. *Jenkins*, 82 Conn. App. 111, 114–15 n.1, 842 A.2d 1148 (2004).

tional violation clearly exists and clearly deprived him of a fair trial.

"Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Ramirez*, 79 Conn. App. 572, 578, 830 A.2d 1165, cert. denied, 267 Conn. 902, 838 A.2d 211, 212 (2003).

On September 3, 2002, the court held an evidentiary hearing on the defendant's motions to suppress and to dismiss. In ruling on those motions, the court set forth detailed factual findings related to the circumstances of the defendant's detention by the police on July 16, 2001, as well as the circumstances under which the defendant gave his statement to the police on July 17, 2001. On the basis of the evidence adduced at the hearing, the court found that Innaimo went to the defendant's residence after speaking with Campbell, Johnson and Palmieri. Palmieri told Innaimo the defendant's name, and Innaimo thereafter obtained the defendant's

address "from the police computer." The court further found that Innaimo and Davino arrived at the defendant's residence without an arrest or search warrant. They knocked at the door to the defendant's residence. A woman answered the door and the defendant voluntarily came to the door. The defendant did not attempt to close the door or otherwise to retreat back into his residence. The court noted that the evidence was uncontroverted that "initially the defendant's hands were concealed within his T-shirt [and] the officers drew their weapons and ordered the defendant to put his hands where they could be seen." The defendant complied with that request and, at that time, Innaimo and Davino took the defendant into custody at his front door "for the purpose of a show-up [identification]" by Palmieri. They brought the defendant approximately 300 feet away from his residence for security reasons. After Palmieri positively identified the defendant, the police, having "ample probable cause at this point to arrest the defendant," placed him under arrest.

As a preliminary matter, having reviewed the evidence presented, we conclude that the evidence amply supports the court's factual findings. The defendant argues that the court's finding that he voluntarily presented himself at the door to his residence was clearly erroneous. In this regard, the defendant relies on Innaimo's testimony concerning what occurred when he and Davino arrived at the defendant's residence: "We knocked on the door; a lady came to the door. I said, 'Does [the defendant] live here?' . . . 'Yes, he does.' Some questions were asked, 'Why do you want him?' 'What are you looking for?' And in the background inside the apartment, I could see [the defendant] with his hands inside his shirt." Innaimo recalled that, knowing that the perpetrator had used a gun in committing the crimes, he and Davino ordered the defendant to

raise his hands in the air before placing him in their police cruiser.

Shortly before so testifying, however, Innaimo had testified that, when he and Davino arrived at the defendant's residence, he asked the woman who answered the door if the defendant lived at the residence, "and then at that time, [the defendant] came to the door." Further, the defendant testified at the hearing on his pretrial motions that when he heard a knock on his door, he "limped to the door" and opened it, encountering Innaimo.[2] The court was free to credit this account of what transpired.

We next conclude that, under the facts as found, the police did not arrest the defendant without probable cause when they took him from the doorway of his residence. Instead, as Innaimo testified, the officers' actions constituted an investigative detention. "Under the fourth amendment to the United States constitution, and under article first, [§§ 7 and 9] . . . of the Connecticut constitution, a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime." (Internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 281, 764 A.2d 1251 (2001). "Any inquiry into the permissible justification for, and boundaries of, a particular investigatory detention . . . is necessarily fact-bound. . . . Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of

_____

[2] The defendant also testified that a police officer had entered his residence, grabbed him and pulled him outside. The court specifically discredited the defendant's version of events. The court stated: "I will credit the testimony of police officer Richard Innaimo, and his version of the events as opposed to the defendant's version." The evidence supports the court's finding that the police did not enter the defendant's residence, but apprehended the defendant when he appeared in his doorway. For this reason, we need not address that part of the defendant's claim that is based upon his assertion that the officers entered his home without a warrant.

mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . The police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Citations omitted; internal quotation marks omitted.) *State* v. *Trine*, 236 Conn. 216, 224–25, 673 A.2d 1098 (1996).

Here, the court found that the defendant voluntarily presented himself at the doorway of his residence in response to a knock on his door by a police officer. The defendant did not attempt to close his door or to retreat into his residence upon encountering the officers. The court did not find that the officers had engaged in deceptive or coercive behavior. Under our fourth amendment jurisprudence, the defendant, under these circumstances, was taken into investigatory detention in a public place, not in the privacy of his home. See *State* v. *Santiago*, 224 Conn. 494, 504, 619 A.2d 1132 (1993) ("[i]f, standing in the threshold of one's home, an individual is visible to and accessible to the public, he or she can be legally arrested without a warrant under the fourth amendment to the United States constitution"). Here, the court specifically noted that the circumstances of this case fell within the rule set forth in *Santiago*.

The defendant suggests that an arrest had taken place because, under the circumstances of his detention, he did not feel that he was free to walk away. The defendant points out that the officers, upon viewing him in his doorway, drew their weapons, removed him from the doorway of his residence, put him in the back of a police cruiser and brought him to the entrance of his apartment complex, where Palmieri was waiting to

identify him. Our law is clear, however, that police action in detaining a suspect and requiring a suspect to accompany officers to another place does not transform an investigative detention into an arrest. *State* v. *Mitchell,* 204 Conn. 187, 198–200, 527 A.2d 1168 (noting that requiring suspect to accompany police officer to another place or detaining suspect to effectuate viewing by witnesses to crime deemed permissible investigative techniques), cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987). Here, the defendant does not claim that he was detained for an unreasonable amount of time. It is reasonable to conclude that the detention lasted only as long as required to permit a viewing of the defendant by Palmieri, at which time the officers' suspicions would either be confirmed or dispelled.

Additionally, the fact that the officers took security measures by, as the defendant argues, drawing their weapons, patting him down, handcuffing him and placing him in their police cruiser did not transform the detention into an arrest. If it is reasonable to believe that a detained individual might pose a danger, officers may take steps to protect themselves, including undertaking a patdown search to discover weapons. See *State* v. *Clark,* supra, 255 Conn. 281–82; *State* v. *Wilkins,* 240 Conn. 489, 495–96, 692 A.2d 1233 (1997). Here, Innaimo testified that his presence and that of his fellow police officers at the defendant's apartment complex created a somewhat "hostile" situation because "people in the area . . . just didn't like the police presence at the time." Further, the officers were aware of the violent nature of the armed crimes that the perpetrators allegedly had committed. For those reasons, the officers were justified in approaching the defendant, whom they viewed as a suspect, with an eye toward protecting their own safety. The fact that the officers treated the defendant with the security precautions that they did, including taking him 300 feet from his doorway to a

place that, in their view, provided them more security while Palmieri viewed the defendant, in no way transformed the detention into an arrest.

The defendant also argues that the officers did not lawfully seize him as part of an investigatory detention because such a detention was not supported by a reasonable and articulable suspicion. The court found that the officers were warranted in removing the defendant from his home for purposes of permitting Palmieri to identify him. The facts found show that, at the time that the officers went to the defendant's residence, they had spoken with Campbell and Johnson regarding the alleged violent incident at Campbell's residence. The officers then encountered Palmieri, who described the violent incident at his residence. Palmieri told the officers that one of the armed intruders was "Maurice Weaver" and that he knew the second armed intruder as "Bootsey." After relaying the name "Maurice Weaver" to police headquarters, Innaimo obtained the defendant's address, and he and Davino immediately proceeded to it. Upon arriving at the defendant's residence, a woman at the door informed the officers that a "Maurice Weaver" lived there, and the defendant came to the door. All of that information, known to the officers at the time of the detention, formed the basis of an objectively reasonable suspicion that the defendant had committed a crime.

Having concluded that the defendant was not arrested until after Palmieri's identification of him, we reject the defendant's claim that the court should have suppressed either Palmieri's identification of him or the defendant's subsequent confession. The police lawfully detained the defendant until his arrest and, accordingly, the exclusionary principle on which he relies does not apply.

## II

The defendant was convicted, as a result of his conduct in Palmieri's residence, of burglary in the first degree, attempt to commit robbery in the first degree and conspiracy to commit robbery in the first degree. At the close of the state's case-in-chief, the defendant moved for a judgment of acquittal with regard to those crimes; the court denied the motion. The defendant reiterates his claim here that the evidence did not support any of those convictions. We disagree.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether, upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . In conducting this review, the probative force of the evidence is not diminished where the evidence, in whole or in part, is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Holmes*, 75 Conn. App. 721, 739–40, 817 A.2d 689, cert. denied, 264 Conn. 903, 823 A.2d 1222 (2003).

### A

In this case, to warrant a conviction for burglary in the first degree in violation of General Statutes § 53a-101 (a) (1),[3] the state bore the burden of proving the

---

[3] General Statutes § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument . . . ." Here,

following elements beyond a reasonable doubt: (1) the defendant entered or remained unlawfully in a building, (2) he did so with the intent to commit the crime of robbery therein and (3) he was armed with a dangerous instrument.

The defendant does not dispute that the evidence was sufficient to prove the third element. Rather, the defendant claims that there was insufficient evidence to support a finding that he entered or remained unlawfully in Palmieri's residence. General Statutes § 53a-100, which contains definitions applicable to § 53a-101, provides in relevant part: "A person 'enters or remains unlawfully' in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so." General Statutes § 53a-100 (b). "To enter unlawfully means to accomplish an entry by unlawful means, while to remain unlawfully means that the initial entering of the building . . . was lawful but the presence therein became unlawful because the right, privilege or license to remain was extinguished. When either of these situations is established, the threshold element of burglary is present." (Internal quotation marks omitted.) *State* v. *Stagnitta*, 74 Conn. App. 607, 612, 813 A.2d 1033, cert. denied, 263 Conn. 902, 819 A.2d 838 (2003). "This court has held that an entry occurs with [a]ny penetration, however slight, of the space within the . . . [building] by the defendant, or by any part of his body . . . ." (Internal quotation marks omitted.) *State* v. *Griffin*, 78 Conn. App. 646, 650, 828 A.2d 651 (2003).

Here, the state presented Palmieri's testimony that, at the time of the incident, he was in his condominium, watching television and eating dinner. He was accompa-

the state charged that the defendant committed the crime armed with a dangerous instrument.

nied by Sherman, Cross and Schofield. Palmieri recalled that he suddenly heard footsteps coming up the stairs to the "living level" of his unit. He saw the defendant, whom he recognized as having accompanied Sherman to his residence a few weeks earlier, holding a gun. In addition, he saw another man holding a gun, who was wearing a mask.

Palmieri further testified that one of the men stated, in an excited tone, "Shit ain't sweet. Where is your money?"[4] Palmieri recalled that he felt as though he was in danger and "was probably as white as a ghost" at that time. Sherman got up from where he was sitting and went into the kitchen where he talked to Echols and the defendant. After the defendant and Echols left, Palmieri locked his front door. He then went back upstairs and asked what was "going on." He recalled that he was "kind of getting the run around . . . ."

On the basis of that testimony, the jury reasonably could have found beyond a reasonable doubt that the defendant had entered Palmieri's residence without having the right, privilege or license to do so. Further, that evidence supported a finding that the defendant remained inside Palmieri's residence without having the right, privilege or license to do so.

The defendant also claims that the evidence was not sufficient to support a finding that he entered or remained unlawfully in Palmieri's residence with the intent to commit the crime of robbery therein. The essential elements of the crime of robbery are: (1) the defendant uses or threatens the immediate use of physical force upon another person, (2) the defendant does so in furtherance of a larceny[5] and (3) such conduct

---

[4] Palmieri testified that he understood this statement to mean that "the situation wasn't sweet and [the defendant and Echols] were there for the money . . . ."

[5] General Statutes § 53a-133 requires that the use or threatened use of physical force upon another person, in the course of committing a larceny, be for the purpose of "[p]reventing or overcoming resistance to the taking

occurs in the course of committing a larceny. General Statutes § 53a-133. "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." General Statutes § 53a-119.

"[W]e are mindful that [i]ntent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Holmes*, supra, 75 Conn. App. 740.

Here, there was ample evidence on which the jury reasonably could have found that the defendant possessed the requisite mental state for the commission of the crime of robbery at Palmieri's residence. The jury had before it evidence of the violent conduct of the defendant and Echols in Campbell's condominium, and the fact that they wanted money and searched for money. The jury also had before it evidence that the defendant and Echols left Campbell's condominium only after learning that they were in the "wrong" condominium, and then they immediately went next door to Palmieri's condominium.

The evidence demonstrated that the defendant and Echols entered Palmieri's condominium unlawfully, brandishing guns. They spoke threatening words and asked: "Where is your money?"[6] Echols was wearing a

---

of the property or to the retention thereof immediately after the taking; or . . . compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-133.

[6] The defendant argues in his brief that he and Echols "never demanded money" from anyone in Palmieri's residence. Palmieri's testimony clearly afforded the jury a basis upon which to find otherwise.

mask. In light of that and all of the evidence, the jury reasonably could have found that the defendant entered Palmieri's residence with Echols intending to deprive another person of his property by threatening the use of immediate physical force to compel that person to give the property to him.

The defendant posits, in his appellate brief, that he entered Palmieri's residence through an unlocked door and that "no money or anything else was taken." Those arguments simply miss the point. The evidence demonstrated that the defendant lacked any entitlement to enter Palmieri's residence, through any entryway, unlocked or otherwise. Further, the fact that the defendant left Palmieri's residence without having taken any money in no way detracts from his larcenous intent.

## B

In this case, to warrant a conviction for attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (4), the state had the burden of proving that the defendant, acting with the mental state to commit the crime of robbery in the first degree, intentionally did or omitted to do something which, under the circumstance as he believed them to be, was an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime of robbery in the first degree.

The defendant reiterates his claim that the state did not present sufficient evidence to prove beyond a reasonable doubt that he acted with the intent to commit a larceny in Palmieri's residence, or that he performed a substantial step that was corroborative of such an intent. The defendant posits that "there is insufficient evidence to prove beyond a reasonable doubt that [he] ever intended to steal anything from anyone in Palmieri's condominium."

We have already concluded in part II A that evidence of the defendant's actions and statements permitted the jury to find that he possessed the intent to commit a larceny in Palmieri's residence. The defendant concedes that "it is not every day that a person enters someone's home carrying a gun," but argues that his conduct, in light of all of the evidence in this case, did not portray a larcenous intent. By so arguing, the defendant does little more than ask us to disregard a common sense view of the evidence, one that we expect the jury to employ. See *State* v. *Eastwood*, 83 Conn. App. 452, 474, 850 A.2d 234 (2004). This we will not do.

We likewise conclude that the evidence of the defendant's conduct constituted a substantial step toward the commission of the crime. The jury reasonably could have concluded that the defendant, entering Palmieri's residence with Echols in the manner that he did, threatened the use of physical force in the commission of a larceny.

C

In this case, to warrant a conviction for conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134, the state had the burden of proving beyond a reasonable doubt that (1) the defendant intended that conduct constituting the crime of robbery in the first degree be performed, (2) the defendant agreed with one or more persons to engage in or cause the performance of such conduct and (3) any one of them committed an overt act in furtherance of such conspiracy.

With regard to this claim, the defendant again argues that "the state failed to prove this charge beyond a reasonable doubt because the requisite intent to commit a larceny was not proven beyond a reasonable doubt." We already have rejected that argument in parts II A

and B. We therefore affirm the defendant's conviction of conspiracy to commit robbery in the first degree.

## III

Finally, the defendant claims that the state violated his rights to due process and to confrontation under article first, § 8, of the constitution of Connecticut because the police lost two items of evidence. We disagree.

The record discloses that, on the first day of trial, the prosecutor informed the court that he had notified defense counsel that the state possessed only page one of the two page statement that Campbell gave to police concerning the break-in at his residence. The prosecutor stated: "I do not know where page two is. I think if I did have it, I will be obliged, of course, to turn it over to defense counsel. I have never seen it and, quite frankly, I've asked the police department for an explanation, and nobody can tell me what happened to it. So, I just want the record to be clear on that point. It certainly is my belief that Mr. Campbell's testimony is entirely consistent with what he told the police department back when this incident happened. But, unfortunately, I do not have page two of his statement, and I have no explanation for why I don't."

Defense counsel then addressed the court: "Judge, in that regard, then, because we don't know what page two said, I would ask the court to order that the state not ask the police officer if [Campbell] made that statement to them. You know, I mean [if] that's the same thing you told [the police] on June 1, because there's no way for us to see the second part; it's not complete. If Mr. Campbell wishes to testify to what is on there, I mean, you know, basically the same thing, that's fine. But for the state to say, well, this is the same thing you told them, you know, just hours after the incident, I think it's inappropriate, because [the statement is] not

complete. [Campbell] could have said, for instance, 'Oh shucks, I'm lying.' I mean on page two."

The prosecutor indicated that he would refrain from asking any questions related to Campbell's statement, aside from asking Campbell if he gave a statement to the police. The court agreed with this resolution of the issue, and stated that the issue "may not amount to anything in any event." The record reflects that, during trial, the state abided by this agreed resolution of the issue.

The second item of evidence concerns photographs that Campbell and Johnson claimed were shown to them at the police department. During the first day of trial, Campbell testified that detectives at the police department showed him between six and eight photographs and asked if he could identify any of the people depicted in the photographs, but that he could not. After Campbell testified, defense counsel indicated to the court that he had a "concern" because he did not have any information about Campbell having been shown an array at the police department, and, if the defendant's photograph was among those in the array, such evidence would have been favorable to the defendant. The prosecutor indicated that, one week earlier, Campbell had indicated to him that he had been shown some photographs at the police department. The prosecutor represented that he had checked "the evidence" and found no evidence concerning a photographic array and that "there is no record of what photographs were shown to him." The court instructed the prosecutor to look into the matter.

Later, Johnson testified that, while at the police department on July 16, 2001, she had looked through approximately twelve photographs. She recalled that she could not identify any of the persons in the photographs.

The prosecutor reported back to the court concerning his efforts to find any more information concerning photographs that may have been shown to Campbell and Johnson. He represented that he spoke with the supervisor of detectives at the Waterbury police department and learned that six detectives were working on July 16, 2001. In their testimony, Campbell and Johnson provided a physical description of the person who showed them photographs. The prosecutor stated that, in his estimation, the only person who matched that description was Detective David Balnis. He stated that Balnis informed him that he had "no recollection of ever showing pictures to either of the witnesses, and [that] he has checked the entire file." At the defendant's request, the prosecutor agreed to ask Balnis and Philip DiStiso, who took Campbell's statement on July 16, 2001, to meet with defense counsel to discuss the matter. During trial, none of the police department personnel who testified recalled showing either Campbell or Johnson a photographic array. DiStiso testified that he did not recall either himself or anyone else showing photographs to Campbell or Johnson.[7]

The defendant concedes that, at trial, he "did not seek to dismiss the informations or suppress any evidence surrounding the lost statement and photographs."[8] The

[7] During closing argument, defense counsel argued in pertinent part: "Another troubling thing. [The police] showed Miss Johnson and Mr. Campbell pictures. That's troubling to me, and I suggest that should be troubling to you. What if they showed [the defendant's] picture to Mr. Campbell and Mr. Campbell didn't pick him out two hours later? Now Miss Johnson says, 'Well, they showed me the pictures, but [the defendant's] picture wasn't in there.' We don't have those pictures. We can't find them. Can I tell you that his picture was there, and that they didn't pick it up? No. I can't tell you that. When I had the detective on the stand, and I asked him, 'Do you know who the phantom was that's walking around in the police station showing pictures to people that he didn't know?' See. So that's a little troubling."

[8] Our Supreme Court has observed that a defendant may challenge the failure of the police to preserve potentially exculpatory evidence by filing *either* a motion to dismiss charges filed against him *or* a motion to suppress testimony concerning the unpreserved evidence. *State* v. *Morales*, 232 Conn. 707, 728 n.24, 657 A.2d 585 (1995).

defendant also did not argue at trial that the loss of the second page of Campbell's statement or the lack of any evidence concerning the photographs shown to Campbell or Johnson violated his rights to due process or to confrontation. Nevertheless, the defendant now seeks review of his claim under *Golding*. Although the record is adequate for review and the claim is of constitutional magnitude, it fails under *Golding*'s third prong because the defendant has failed to demonstrate that a constitutional violation clearly exists that clearly deprived him of a fair trial.

A

We first address the defendant's claim that the state's loss of evidence violated his right to due process under article first, § 8, of the constitution of Connecticut.[9]

Our Supreme Court, in *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995), set forth the analysis applicable to the present claim. The court held that, in determining whether the failure of the police to preserve evidence that might be useful to an accused constitutes a violation of that accused's right to a fair trial under our state constitution, a trial court must, essentially, "[weigh] the reasons for the unavailability of the evidence against the degree of prejudice to the accused." Id., 727. More specifically, it held that "the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." (Internal quotation marks omitted.) Id. If the court finds preju-

[9] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

dice as a result of the lost evidence, it may take whatever action it deems necessary to remedy it.[10]

The first factor to consider is the materiality of the lost evidence. "The measure of materiality is whether there is a reasonable probability that, had the [lost evidence] been available to the defense at trial, the result of the proceeding would have been different." *State* v. *Jones*, 50 Conn. App. 338, 357, 718 A.2d 470 (1998), cert. denied, 248 Conn. 915, 734 A.2d 568 (1999). There is no record of what was in the second page of Campbell's statement,[11] and there is no record of any photographs shown to Campbell and Johnson. These facts limit our review. Nevertheless, the evidence strongly suggests that neither the missing second page of Campbell's statement nor the missing photographic arrays allegedly shown to Campbell and Johnson would have changed the result of the trial.

At trial, Campbell testified about the events that he reported to the police. The first page of his statement sets forth his recollection of the invasion of his residence up to and including the time when the perpetrators left his residence. That narrative of events underlies the defendant's conviction, and these events provided the gist of Campbell's testimony at trial. DiStiso also testified concerning what Campbell told him, and both

[10] The court stated, with regard to the trial court's duty in fashioning an appropriate remedy: "Put simply, a trial court must decide each case depending on its own facts, assess the materiality of the unpreserved evidence and the degree of prejudice to the accused, and formulate a remedy that vindicates his or her rights. . . . The ultimate question for the trial court in such a case is: What remedy best serves the interests of justice?" (Citation omitted.) *State* v. *Morales*, supra, 232 Conn. 729.

[11] In its brief to this court, the state represents that it discovered the missing second page of Campbell's statement during the preparation of the appeal. The state included the missing page in its brief and represented that it provided a copy of the same to the defendant. The state argues that the second page contains only a few sentences that do not contradict any of the representations contained on page one of the statement.

witnesses were subject to cross-examination by the defendant.

The defendant argues, with regard to the photographic arrays, that the police may have shown Campbell and Johnson his photograph. He argues that, had Campbell or Johnson failed to pick his photograph from the array, the array itself was potentially exculpatory evidence. The evidence demonstrates that, at the time that Campbell and Johnson claimed to have been shown photographs, the police had not yet interviewed Palmieri, who identified the defendant as a suspect. Thus, there is nothing to suggest that the police would have included the defendant's photograph in a photographic array. Campbell and Johnson identified the defendant at trial and testified that they had not identified the perpetrator in the photographic array that the police showed them. More importantly, the state presented evidence at trial that the defendant confessed that he and Echols forcibly invaded Campbell's residence in the manner that Campbell testified.

The second factor to consider is the likelihood of mistaken interpretation of the missing evidence by witnesses or the jury. No such danger is evident here. With regard to the missing second page of Campbell's statement, the court agreed with the parties' resolution of the issue, namely, that the state would not inquire about Campbell's statement other than to ask Campbell if he gave a statement to the police. With regard to the issue of a photographic array, the state did not elicit any testimony that could have misled the jury. Moreover, the defendant elicited testimony regarding the fact that the detectives did not know about the photographs described by Campbell and Johnson. The defendant's attorney argued that the jury should apply a negative inference against the state concerning these photographs. See footnote 7. The defendant, however, did not ask the court to give the jury an adverse inference

instruction concerning the state's failure to preserve either items of evidence.

The third factor concerns the reasons for the unavailability of the evidence, specifically, the motives underlying the destruction or loss of the evidence. "In examining the motives . . . our courts have considered such factors as whether the destruction was deliberate and intentional rather than negligent . . . or done in bad faith or with malice . . . or with reckless disregard . . . or calculated to hinder the defendant's defense, out of other animus or improper motive, or in reckless disregard of the defendant's rights." (Internal quotation marks omitted.) *State* v. *Jones*, supra, 50 Conn. App. 358. Here, the record neither discloses nor suggests that the state lost the evidence by reason of bad faith or improper motive.

Finally, we must consider the prejudice to the defendant caused by the unavailability of the evidence. The defendant argues that this evidence was potentially exculpatory. The state's case against the defendant, which was not in any way based upon the lost evidence, was strong. At trial, Palmieri, Campbell and Johnson, who were eyewitnesses to the crimes, identified the defendant. Palmieri identified the defendant by name shortly after the incident at his residence, and personally identified the defendant later that day and at trial. There was evidence that the defendant confessed to the incident in Campbell's residence. Simply put, there is nothing to suggest that the production of either of these items of evidence would have strengthened the defense. At trial, the defendant agreed with the state that the best way to resolve the issue of the missing second page of Campbell's statement was to preclude the state from inquiring specifically about the statement at all. With regard to the missing photographic array, the defendant amply brought the issue before the jury

and argued that the jury should apply a negative inference against the state with regard to this evidence.

For all of the foregoing reasons, we conclude that the defendant has failed to demonstrate that his right to due process was violated on account of the missing evidence.

## B

We next address the defendant's claim that the state's loss of evidence violated his right of confrontation under article first, § 8, of the constitution of Connecticut.[12]

The defendant argues that he was deprived of his right to confrontation because DiStiso denied knowing about a photographic array "despite Campbell's testimony that DiStiso was present when the photographs were shown to him." Further, the defendant argues that the prosecutor "provided no explanation regarding the information contained" on the second page of Campbell's statement, and that this missing evidence interfered with his "right to fully and effectively cross-examine several witnesses . . . ."

"The defendant is entitled fully and fairly to confront and cross-examine the witnesses against him. . . . The primary interest secured by the right of confrontation is the right to cross-examine witnesses. . . . The defendant does have a right under the confrontation clause to expose to the jury the facts from which jurors, as the sole triers of facts and credibility, [can] appropriately draw inferences relating to the reliability of the [state's] witnesses. . . . The confrontation clause requires that [if] the testimony of such a witness is to remain in the case as a basis for conviction, the defen-

---

[12] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

dant must be afforded a reasonable opportunity to discover any infirmities that may cast serious doubt upon its truthfulness. . . . The right of cross-examination is not, however, absolute." (Citations omitted; internal quotation marks omitted.) *State* v. *Jones*, supra, 50 Conn. App. 360–61.

Here, the defendant was afforded an opportunity to cross-examine the state's witnesses. The defendant does not claim that the court placed any restrictions on his ability to cross-examine Campbell or Johnson with regard to whether they were shown photographs. Furthermore, the defendant does not claim that the court precluded him from cross-examining the detectives from the Waterbury police department concerning whether Campbell and Johnson were shown photographs at the police department. The record discloses that such unfettered cross-examination occurred.

Although we treat the issue of the photographic array as an issue of lost evidence, the fact that photographs were lost was not agreed on at trial. Campbell and Johnson testified that they were shown photographs. The detectives, who presumably would have presented such photographs to Campbell and Johnson at the police department, testified that they did not show photographs to either witness. The defendant elicited testimony concerning the presentation of the photographs, examined the state's witnesses concerning the subject and argued before the jury that it should hold the missing photographs against the state. Although the defendant now argues that having the photographs might have helped in his cross-examination of Campbell and Johnson, what is important for our consideration is that the court did not in any way restrict the defendant from examining the subject with all the witnesses involved. The jury was free to credit the testimony of the witnesses as it deemed proper and, as the defendant argued at trial, hold the loss of such evidence against the state.

The defendant fails to adequately explain, let alone support, his claim that the loss of the second page of Campbell's statement hampered his ability to cross-examine Campbell. The record reflects that the defendant freely cross-examined Campbell regarding his account of what had transpired in his residence. Accordingly, we conclude that the defendant's claim that missing evidence infringed upon his right of confrontation is without merit.

The judgments are affirmed.

In this opinion the other judges concurred.