# STATE OF CONNECTICUT *v.* CATALINO MORALES
## (AC 23830)

Schaller, McLachlan and Dupont, Js.

Argued February 15—officially released July 5, 2005

*Robert E. Byron*, special public defender, for the appellant (defendant).

*Julia K. Conlin*, deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Sandra L. Tullius*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Catalino Morales, appeals from the judgment of conviction, rendered after a jury trial, of various criminal offenses.[1] On appeal,

---

[1] The defendant was convicted of three counts of attempt to commit murder in violation of General Statutes §§ 53a-54a and 53a-49, three counts of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-49, three counts of attempt to commit assault of public safety personnel in violation of General Statutes §§ 53a-167c (a) (1) and 53a-49, and carrying a pistol without a permit in violation of General Statutes § 29-35.

the defendant argues that his rights to due process were violated when (1) the trial court improperly allowed testimony regarding evidence that was not preserved by the state and (2) the prosecutor committed misconduct. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In June, 2001, members of the Connecticut violent crimes fugitive task force received information that the defendant and Raymond Solano were located at 192 Mark Twain Drive in Hartford. Arrest warrants had been issued for both men as a result of events that occurred in Allentown, Pennsylvania. The task force, after performing reconnaissance and surveillance, confirmed that the defendant and Solano were present at that location, as was a Dodge Neon automobile. In order to safely apprehend the individuals, the Hartford police department emergency response team was called to serve the warrants and to arrest the defendant and Solano.

The team split into two groups. Additionally, team leaders assigned three snipers to the rooftop of a nearby school. After observing the defendant near the Dodge Neon, one of the groups advanced, identified themselves as police officers and ordered the defendant to get on the ground. The defendant looked at the oncoming officers, squatted between the Dodge Neon and another car, and then stood back up with a gun in his hand and his arm raised. The defendant had placed one bullet in the chamber of the gun and then loaded the magazine to capacity. Before the defendant attempted

The jury acquitted the defendant of two counts of attempt to commit murder, two counts of attempt to commit assault in the first degree and two counts of attempt to commit assault of public safety personnel, but convicted him of two counts of the lesser included offense of interfering with an officer in violation of General Statutes § 53a-167a. The state nolled the charge of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1).

to flee, the magazine fell out of the gun. As a result, the only ammunition remaining in the defendant's gun consisted of the single bullet in the chamber. The defendant fired one gunshot at the police officers, who subsequently returned fire. While running, the defendant pointed his gun at the pursuing officers, including Robert Burgos, an officer with the Hartford police department, and made a shooting motion, although no other bullets were discharged from his weapon. The fully loaded magazine subsequently was recovered by the police near the Dodge Neon along with a single spent shell casing.

The defendant, hit by gunfire, fell to the ground and dropped a second gun that he had been carrying. He managed to get back to his feet and to continue running toward the nearby wooded area. He raised his weapon and pointed it directly at the pursuing officers. At that point, one of the snipers, fearing for the safety of his fellow officers, shot the defendant in the leg, incapacitating him.[2] The defendant was arrested, tried, convicted and sentenced to a total effective term of thirty-seven years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly allowed testimony regarding evidence that was not preserved by the state. Specifically, the defendant argues that the court should not have permitted testimony regarding a bullet hole in the hood of the Dodge Neon because he was not given the opportunity to examine the hood before the state returned it to its owner, an innocent third party, who repaired the bullet hole. The defendant further contends that because the state essentially allowed the evidence of the bullet hole in the hood to be destroyed, the court should have granted

---

[2] The team also apprehended Solano.

his motion to strike testimony pertaining to the hood, as well as his motion for a mistrial. We disagree.

The following additional facts are necessary for our discussion of the defendant's claim. On August 7, 2002, Edwin Soto, a Hartford police detective assigned to the evidentiary services division, crime scene unit, testified regarding his investigation of the area of 192 Mark Twain Drive. Soto stated that he and his partner recovered many spent casings associated with bullets fired from Hartford police department weapons. He also testified that he found one spent casing near the Dodge Neon that did not come from a Hartford police department weapon and that upon examining the Dodge Neon, he discovered what he determined to be a bullet hole in the hood. The hood of the motor vehicle had been raised in the upright position at the time of the shooting. Defense counsel objected, and the court excused the jury. Defense counsel argued that he had not received notice of what he characterized as expert testimony, but admitted that he had reviewed pictures of the hood of the Dodge Neon with the hole in it. The court instructed the state to refrain from eliciting testimony regarding the trajectory of the bullet. The court also informed the defendant that it would allow Soto to be recalled for cross-examination after giving defense counsel time to examine the bullet hole in the hood.

Soto testified in front of the jury that he had found a bullet hole in the passenger side of the hood. The hole appeared to be fresh, and the point of entry was the exterior of the hood. Several photographs of the hole were introduced into evidence. The jury also heard testimony that two of the officers had been located directly behind the hood when the defendant fired his gun. The court informed the jury that the defendant's cross-examination of Soto would be postponed until a later date.

On August 12, 2002, the defendant represented to the court that the state had made efforts to locate the Dodge Neon in order to allow the defendant to examine the bullet hole. The car had been returned to its owner, Johnny Santiago, on July 17, 2001. Guillermo Acaron, the defendant's investigator, attempted to serve a subpoena on Santiago, who stated that he did not want to disclose the location of the Dodge Neon or to cooperate in any manner. On August 14, 2002, the court issued a capias ordering that Santiago be taken into custody.[3] Later that afternoon, Acaron testified that he had examined the Dodge Neon and that it appeared to have been repaired with patching agent, sanded smooth and primed for painting. Acaron also stated that he had taken photographs of the repaired hood, but had not yet developed them.

The defendant's expert, Marshal Robinson, testified that he reviewed the photographs and agreed that a bullet caused the hole in the hood. He further testified that had he been able to examine the hood personally, he could have determined the trajectory of the bullet, its angle of entry and its caliber. Robinson testimony was consistent with Soto's opinion that the bullet that caused the hole originated from the rear of the car proceeding toward the front. Robinson stated that he did not go with Acaron to view the repaired hood of the Dodge Neon.

On appeal, the defendant claims that the failure of the police to preserve the bullet hole in the hood of the Dodge Neon violated his state constitutional right to due process.[4] Because the court found no evidence

---

[3] General Statutes § 54-2a (a) provides in relevant part: "In all criminal cases the Superior Court, or any judge thereof . . . may issue . . . (3) capias for witnesses and for defendants who violate an order of the court regarding any court appearance . . . ."

[4] The defendant also argues in his brief that "[t]his issue concerns the admission of evidence. The standard of review is abuse of discretion. *State* v. *Williamson*, 212 Conn. 6, 28, 562 A.2d 470 (1989)." In denying the defendant's motion for a mistrial, the court stated that there was no due process violation

of bad faith on the part of the police in failing to preserve the hood, as required under the federal standard set forth in *Arizona* v. *Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), and because the defendant has not challenged that finding on appeal, we focus our analysis on the state constitution.[5] See *State* v. *Valentine*, 240 Conn. 395, 416–17, 692 A.2d 727 (1997); see also *State* v. *Joyce*, 243 Conn. 282, 300, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998); *State* v. *Jones*, 50 Conn. App. 338, 356–57, 718 A.2d 470 (1998), cert. denied, 248 Conn. 915, 734 A.2d 568 (1999).

In *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995), our Supreme Court squarely addressed the situation in which the police department fails to preserve evidence that might be useful to the defendant. Id., 714. Our Supreme Court concluded: "[T]he good or bad faith of the police in failing to preserve potentially useful evidence cannot be dispositive of whether a criminal defendant has been deprived of due process of law. Accordingly, we, too, reject the litmus test of bad faith on the part of the police, which the United States Supreme Court adopted under the federal constitution in *Youngblood*. Rather, in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the [*State*

---

because the evidence that had been destroyed would not have materially aided the defendant. The defendant also states that "[i]n addition to principles of evidence, concerns of due process are implicated when the state loses real evidence in its possession." The defendant has not argued a violation of due process under the federal constitution.

We are persuaded that the dispositive issue is of constitutional nature rather than a mere evidentiary question. Thus, we focus our analysis on whether the defendant's state constitutional right to due process under article first, § 8, of the constitution of Connecticut was violated as a result of the loss of the hood before the defendant could have it examined.

[5] The state constitution may afford greater rights to a defendant than the federal constitution. See *State* v. *Linares*, 232 Conn. 345, 381, 655 A.2d 737 (1995).

v. *Asherman*, 193 Conn. 695, 724, 478 A.2d 227 (1984),
cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed.
2d 814 (1985)] balancing test, weighing the reasons for
the unavailability of the evidence against the degree of
prejudice to the accused. More specifically, the trial
court must balance the totality of the circumstances
surrounding the missing evidence, including the follow-
ing factors: the materiality of the missing evidence, the
likelihood of mistaken interpretation of it by witnesses
or the jury, the reason for its nonavailability to the
defense and the prejudice to the defendant caused by
the unavailability of the evidence." (Internal quotation
marks omitted.) *State* v. *Morales*, supra, 726–27; see
also *State* v. *Valentine*, supra, 240 Conn. 417; *State* v.
*Coleman*, 38 Conn. App. 531, 535, 662 A.2d 150, cert.
denied, 235 Conn. 906, 665 A.2d 903 (1995). If the court
finds that the defendant has been prejudiced as a result
of the lost evidence, it may take whatever action it
deems necessary in order to provide a proper remedy.
See *State* v. *Weaver*, 85 Conn. App. 329, 350–51, 857
A.2d 376, cert. denied, 271 Conn. 942, 861 A.2d 517
(2004). We address each of the *Asherman* prongs in
turn.[6]

---

[6] The defendant argues in his brief that a trilogy of cases, *State* v. *Johnson*,
214 Conn. 161, 571 A.2d 79 (1990), *State* v. *Williamson*, 212 Conn. 6, 562
A.2d 470 (1989), and *In re Jesus C.*, 21 Conn. App. 645, 575 A.2d 1031, appeal
dismissed, 216 Conn. 819, 581 A.2d 1055 (1990), require the trial court, prior
to employing the *Asherman* test, to determine which side bears the burden
of proof. According to the defendant, if the state intentionally destroys the
evidence, then the burden is on the state to prove that nonproduction of
the evidence was harmless. The defendant argues that the court failed to
shift that burden to the state.

The defendant's argument is flawed for several reasons. First, *Johnson*,
*Williamson* and *In re Jesus C.* all were decided *prior to State* v. *Morales*,
supra, 232 Conn. 707. Second, those cases concerned the destruction of
audio recordings made by the police department of witness statements.
Those claims were based on Practice Book §§ 752 and 755, both of which
have been repealed. The tapes of witness statements clearly were both made
by and in the possession of the police department, and the custody of those
tapes did not present the logistical difficulties of maintaining the hood of
a car that belonged to an innocent third party. We conclude, therefore, that

The first factor of the *Asherman* test addresses the materiality of the lost evidence. "The measure of materiality is whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Internal quotation marks omitted.) *State* v. *Spillane*, 54 Conn. App. 201, 224–25, 737 A.2d 479 (1999), rev'd on other grounds, 255 Conn. 746, 770 A.2d 898 (2001). We are satisfied that had the hood been available at the time of trial, the result would not have been different. Soto's testimony regarding the freshness of the bullet hole and the direction from which it came merely buttressed the testimony of the officers who had described the location of the defendant, the location of the single spent casing that was determined not be police ammunition, the defendant's raising of his arm with a gun in hand, and the muzzle flash and gunshot. Moreover, Robinson, the defendant's own expert agreed, on the basis of his review of the photographs, that the hole in the hood of the Dodge Neon was caused by a bullet and that the bullet came from the rear of the car. Accordingly, the inability of the defense to examine the hood prior to it being repaired was, at best, nothing more than a collateral issue.

The second *Asherman* factor we must consider is "the likelihood of mistaken interpretation of [the missing evidence] by witnesses or the [trier of fact] . . . ." (Internal quotation marks omitted.) *State* v. *Jones*, supra, 50 Conn. App. 357. The state did not attempt to present evidence regarding the bullet's possible trajectory or angle of entry into the hood, nor did it attempt to demonstrate the caliber of bullet that made the hole.

the court was not required to "shift the burden," as argued by the defendant. The proper course of action, as taken by the court, was to employ the *Asherman* factors as set forth in *Morales* and its progeny. Put another way, it is *Morales* that controls the issue before us, not *Johnson*, *Williamson* and *In re Jesus C.*

The jury was aware that the defendant's expert was not able to perform tests to determine either of those facts as a result of the repairs that had been done. Defense counsel argued to the jury that Soto was not qualified to determine whether it was a bullet hole, failed to take pictures from both sides of the hood and failed to send it to the lab for further testing. He also argued that the police improperly returned it to its owner, who repaired the hole before any testing could be done. Defense counsel stressed to the jury that the trajectory or caliber of bullet could have been determined if such testing had occurred. In light of the evidence offered and the arguments made by counsel, it is unlikely that the jury mistakenly interpreted the missing evidence.

The third factor of the *Asherman* test concerns the reasons for the unavailability of the evidence by examining the motives underlying the loss of the evidence. "In examining the motives . . . our courts have considered such factors as whether the destruction was deliberate and intentional rather than negligent . . . or done in bad faith or with malice . . . or with reckless disregard . . . or calculated to hinder the defendant's defense, out of other animus or improper motive, or in reckless disregard of the defendant's rights." (Internal quotation marks omitted.) *State* v. *Weaver*, supra, 85 Conn. App. 353. Here, the record neither discloses nor suggests that the state lost the evidence by reason of bad faith or improper motive.

The fourth factor of the *Asherman* test concerns the prejudice caused to the defendant as a result of the unavailability of the bullet hole in the hood. "In measuring the degree of prejudice to an accused caused by the unavailability of the evidence, a proper consideration is the strength or weakness of the state's case, as well as the corresponding strength or weakness of the defendant's case." (Internal quotation marks omitted.) *State*

v. *Joyce*, supra, 243 Conn. 303. On the basis of the testimony and exhibits, aside from the bullet hole, the state clearly proved that while two officers were in front of the Dodge Neon, the defendant looked in that direction, dropped to the ground, rose up with his arm extended and fired his weapon. Additionally, Burgos stated that he locked eyes with the defendant, who pointed his gun at Burgos, causing him to fear for his life. Further testimony established that as the defendant fled, he continually pointed his gun at the pursuing officers and repeatedly made a motion indicating he was trying to fire his weapon, which was out of ammunition due to the magazine having fallen out. We also note that the defendant examined the pictures of the bullet hole in the hood prior to trial. Finally, the defendant argued to the jury that as a result of the state returning the Dodge Neon to its owner, he was precluded from performing tests to determine the trajectory and caliber of bullet that had penetrated the hood. As a result of the foregoing evidence, we cannot conclude that the defendant was prejudiced as a result of the unavailable evidence.

For the foregoing reasons, we conclude that the defendant has failed to demonstrate that his right to due process under the Connecticut constitution was violated by the failure to preserve evidence and agree that the court properly denied the defendant's motion for a mistrial.

II

The defendant next claims that his right to due process under the federal constitution was violated as a result of prosecutorial misconduct. Specifically, the defendant argues that the prosecutor improperly expressed her opinion as to the ultimate issue, misrepresented the evidence during closing argument, unfairly surprised the defendant at trial with evidence of the

bullet hole in the Dodge Neon and elicited testimony that she knew to be untrue. The state responds that the challenged statements do not constitute misconduct and, alternatively, that even if the comments were improper, they did not deprive the defendant of a fair trial. We agree with the state.

At the outset, we note that the defendant conceded in his brief that his claims of prosecutorial misconduct were not preserved and that he therefore requested review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). After the defendant filed his brief, our Supreme Court stated that "*Golding* is inapplicable to unpreserved prosecutorial misconduct claims. Instead, a reviewing court must apply the [factors enumerated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)] to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 235 n.84, 864 A.2d 666 (2004). Accordingly, we will review the defendant's claim.

Nevertheless, "[t]his does not mean . . . that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial. . . . Moreover, ordinarily, when a defendant who raises an objection to the allegedly improper remarks of a prosecutor elects to pursue one remedy at trial instead of another, he will not be permitted to claim

on appeal that the remedy he pursued was insufficient. . . . In other words, the fact that defense counsel did not object to one or more incidents of misconduct must be considered in determining whether and to what extent the misconduct contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Internal quotation marks omitted.) Id.

We begin our analysis by identifying our well established procedure for determining claims of prosecutorial misconduct. "[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Fauci*, 87 Conn. App. 150, 163–64, 865 A.2d 1191, cert. granted on other grounds, 273 Conn. 921, 871 A.2d 1029 (2005). "Once the first step is complete and misconduct has been identified, we must apply the factors set forth in *State* v. *Williams*, [supra, 204 Conn. 540], to determine whether the prosecutorial misconduct was so serious as to amount to a denial of due process. . . . Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Marshall*, 87 Conn. App. 592, 604, 867 A.2d 57, cert. denied, 273 Conn. 925, 871 A.2d 1032 (2005).

The defendant has set forth four areas of alleged misconduct, the majority of which occurred during the state's closing argument.[7] We will address each in turn.

A

The defendant first claims that the prosecutor committed misconduct during closing argument by expressing her opinion as to the ultimate issue, namely, the defendant's guilt. Specifically, the defendant refers to the statement that "[t]he defendant intended to cause the death of another person."

The defendant's claim of prosecutorial misconduct centers on whether the prosecutor during closing argument improperly expressed her personal opinion as to the defendant's conduct, the credibility of various witnesses and on the ultimate issue of guilt. "[I]t is well established that the evaluation of [witnesses'] testimony and credibility are wholly within the province of the trier of fact." (Internal quotation marks omitted.) *State v. Bermudez*, 79 Conn. App. 275, 286, 830 A.2d 288, cert. granted on other grounds, 266 Conn. 921, 835 A.2d 61 (2003).

The state presented a great deal of evidence indicating that the defendant, pointed his weapon at the police officers and repeatedly made a firing motion. Addition-

[7] "[P]rosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . ." (Internal quotation marks omitted.) *State v. Tate*, 85 Conn. App. 365, 371, 857 A.2d 394, cert. denied, 272 Conn. 901, 863 A.2d 696 (2004). "[B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State v. Jacobson*, 87 Conn. App. 440, 457, 866 A.2d 678, cert. granted on other grounds, 273 Conn. 928, 873 A.2d 999 (2005).

ally, evidence was presented to the jury that certain officers were in close proximity to the defendant while he made the firing motion. Such actions demonstrated an intent to cause the death of another person. "[I]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State* v. *Richardson*, 86 Conn. App. 32, 41, 860 A.2d 272 (2004), cert. denied, 273 Conn. 907, 868 A.2d 748, cert. denied, 545 U.S. 1107, 125 S. Ct. 2550, 162 L. Ed. 2d 281 (2005); see also *State* v. *Fauci*, supra, 87 Conn. App. 167, quoting *United States* v. *Modica*, 663 F.2d 1173, 1180 (2d Cir. 1981) (prosecutor free to comment on evidence, including demeanor), cert. denied, 456 U.S. 989, 102 S. Ct. 2269, 73 L. Ed. 2d 1284 (1982). We are satisfied that, considering the prosecutor's argument in context,[8] it was proper comment on the evidence and did not constitute misconduct.

## B

The defendant next claims that the prosecutor misrepresented the evidence during closing argument. Specifically, he challenges various statements concerning the testimony of police officers. We conclude that the prosecutor's comments did not constitute misconduct.

---

[8] During closing argument, the prosecutor stated: "[T]he law tells us what intention the defendant must have with regard to each particular crime charged. Now, remember, we are dealing with intent. We have [an] attempt to commit the crime of murder. The defendant intended to cause the death of another person. And here, because it was not actually a completed crime, this element, that the defendant actually caused the death of such person, does not come into the particular instance. But the defendant must have intended to cause the death of another person for the crime of attempted murder."

The defendant first argues that the prosecutor misrepresented the evidence concerning the location of Officer Lewis Crabtree and Detective Robert Nelson, two members of the emergency response team, at the time the defendant fired his weapon. During closing argument, the prosecutor stated that Crabtree and Nelson were standing in front of the hood and that "they were in line with the bullet that was actually fired from this defendant's gun." That statement was supported by Nelson's testimony during cross-examination. He stated that at the time he heard the defendant fire his weapon, he was standing over an individual whom he was placing in custody and waiting for another officer to bring him handcuffs. Additionally, there was substantial evidence concerning the location of the defendant, the path of the bullet through the hood of the Dodge Neon, and the location of Crabtree and Nelson. The prosecutor's comments regarding the location of Crabtree and Nelson, therefore, were nothing more than proper comments on the evidence.

The defendant next argues that the prosecutor's statements regarding the testimony of Burgos, a member of the emergency response team, were also improper. During her closing argument, the prosecutor stated: "[Burgos] says that not only did he see [the defendant] crouch down and go between those cars—he is not quite sure where [the defendant] is at this point—but he hears the gunshot. And immediately after hearing that gunshot, he sees [the defendant] come up from that crouch. And they lock eyes. They look into each other's eyes. [The defendant] points that gun at [Burgos]. And, as we know, because he no longer had a magazine in the gun when he pulled that trigger, there was nothing, fortunately, that was in the gun at that point to kill [Burgos]. . . . Burgos told you in his own words . . . [that he] was in fear for [his] life."

The defendant objects to the prosecutor's statement that Burgos feared for his life and that the defendant pulled the trigger of the gun. Burgos testified that immediately after hearing a gunshot, the defendant then pointed his gun at him. He then stated that the defendant made "a motion as if to fire again." That caused him to fear for his life.[9]

We are again satisfied that the prosecutor's comments were based properly on the evidence before the jury. Although Burgos testified that the defendant made "a motion as if to fire again," it was a reasonable inference that such an action included pulling the trigger of the gun. Furthermore, on the basis of the testimony that the defendant pointed his gun at Burgos after the defendant had already fired one gunshot, it was a reasonable inference that Burgos feared for his life. We cannot conclude, therefore, that the challenged comments constituted misconduct.

C

The defendant next claims that the prosecutor conducted a "trial by ambush." Specifically, the defendant argues that it was a violation of fundamental fairness for the state to use testimony regarding the bullet hole in the hood of the Dodge Neon. We have already concluded, however, that it was proper for the court to allow the evidence concerning the bullet hole and that the defendant's right to a fair trial was not violated despite the fact that the hood was repaired before the defendant's expert could examine it. Moreover, the defendant conceded in his brief that the state did not violate any of the applicable rules of practice, as the expert witness did not issue a report. We conclude that this claim of prosecutorial misconduct is nothing more

---

[9] The defendant raised an objection to that testimony, which the court overruled.

than an attempt to revisit the issue of the bullet hole in the hood.

## D

The defendant's final claim is that the prosecutor elicited testimony that was not true. Specially, he claims that the prosecutor knew that the defendant could not have fired more than one gunshot and, therefore, it was misconduct for her to elicit testimony from certain police officers that they heard multiple gunshots fired by the defendant. Because we conclude that the defendant was not prejudiced by the prosecutor's conduct, we need not decide whether the prosecutor engaged in any misconduct.

Two police officers and members of the emergency response team testified that they saw three muzzle flashes coming from the defendant's gun. On the basis of their training, that indicated that the defendant had fired three bullets from his gun. That contradicted the evidence that the magazine had fallen out of the gun before the defendant fired it. As a result, the only bullet that could have been fired was the single bullet that had been placed in the chamber of the gun but was no longer in the magazine. Additionally, there was a great deal of testimony regarding the numerous unsuccessful attempts by the defendant to fire additional gunshots due to the fact that the magazine was no longer in the gun, which resulted in it being out of ammunition.

"[T]he knowing presentation of false evidence by the state is incompatible with the rudimentary demands of justice. . . . Furthermore, due process is similarly offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a government witness falsely denies having [received a sentence modification after testifying for the state in a criminal proceeding], the state is obliged to correct the misconception. . . . Regardless of the

lack of intent to lie on the part of the witness, [*Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)] and [*Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)] require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . . A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." (Internal quotation marks omitted.) *State* v. *Goodson*, 84 Conn. App. 786, 803, 856 A.2d 101, cert. denied, 271 Conn. 941, 861 A.2d 515 (2004); see also *State* v. *Paradise*, 213 Conn. 388, 400, 567 A.2d 1221 (1990).

In the present case, the state presented to the jury the testimony of certain officers who believed that they witnessed multiple muzzle flashes originating from the defendant's gun. The officers recorded those opinions in their reports that were completed following the event. The state, however, also presented substantial evidence that it was possible for the defendant to fire only a single gunshot from his weapon. That evidence actually benefited the defendant, as it undermined the credibility of the testifying officers by highlighting a significant difference in the testimony. We fail, therefore, to see how the defendant was prejudiced by the prosecutor's questions to the police officers.

Under those circumstances, we conclude that the prosecutor's conduct in correcting the testimony regarding the number of gunshots fired from the defendant's gun could not have prejudiced the defendant and deprived him of his right to a fair trial. Accordingly, we need not decide whether the prosecutor's conduct constituted misconduct.

The judgment is affirmed.

In this opinion the other judges concurred.