******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# STATE OF CONNECTICUT *v.* KYLE A.*
## (AC 43377)

Elgo, Suarez and Sullivan, Js.

*Syllabus*

Convicted, after a jury trial, of various crimes in connection with an altercation with his brother, A, the defendant appealed to this court. The defendant called A on the phone, and, during that call, A was given reason to believe that the defendant had been consuming alcohol. The defendant expressed his intent to go to A's home, where A lived with his minor daughter. A warned the defendant that he could not come to the home if he was intoxicated because A's daughter was with him. Later that day, while A and his girlfriend, T, were inside of the home, the defendant arrived. The defendant, who did not have a key to the home, banged on the locked front door, and then broke a window on the locked back door and entered the home. A and T fled the home through the front door. The defendant, brandishing a wooden baseball bat, emerged from the home and began to strike A's automobile, which was parked in the driveway, with the bat. The defendant also used the bat to damage property inside of the home. *Held*:

1. The defendant could not prevail on his claim that the state presented insufficient evidence that he committed burglary in the first degree: the state's theory of the case, that the defendant entered or remained unlawfully in the victim's home, was legally viable as the defendant's entry into the home was unlawful because A, who was occupying the home, testified that the defendant was not a resident of the home at the time of the incident, that A and his daughter resided there, and that A had communicated to the defendant that he was not permitted to enter the home and, although the defendant claimed that he was granted a license to enter the home by J, his mother and the undisputed owner of the home, this claim rested entirely on the credibility of J's testimony, which was challenged at trial, and this court presumed that the jury, the sole arbiter of the credibility of the witnesses, disbelieved J's testimony to the extent that she testified that she gave the defendant permission to enter the home; moreover, J's familial relationship to the defendant reasonably could have given the jury reason to consider with skepticism her testimony as, contrary to J's testimony that the defendant had a key to the residence, the state presented evidence that the defendant broke down a door in order to enter the home and that the defendant wrote letters to J in which he urged her not to cooperate with the prosecution; furthermore, the evidence was sufficient to prove beyond a reasonable doubt that the defendant was armed with a dangerous instrument as there was direct evidence, through T's testimony, regarding the defendant's use of a baseball bat in A's driveway immediately after he had illegally entered and remained in A's home, which made it more likely that the defendant possessed the baseball bat while he was inside of the home and that he used the bat to cause damage to property inside of the home, which was undamaged prior to his unlawful entry.

2. The defendant's unpreserved claim that the trial court's instruction to the jury concerning the charge of burglary in the first degree constituted plain error was unavailing: notwithstanding the defendant's claim that the court improperly omitted a necessary portion of the instruction because, although it instructed the jury that it needed to find that the defendant acted with the specific intent to commit either a felony or a misdemeanor in the home, it failed to identify by name one or more specific felony or misdemeanor offenses, the alleged error did not involve the court's failure to include language from a mandatory charging statute; moreover, this court was not persuaded that allowing the alleged error in the instruction to stand uncorrected would work a manifest injustice, as the defendant's argument was undermined by the fact pattern that was reflected in the evidence and expressly relied on by the prosecutor during oral argument, which pointed to the defendant's intent to commit three different crimes, all of which would rise to the level of intent required by the burglary statute; furthermore, although the

better practice would have been for the trial court to have instructed the jury with respect to the intent to commit one or more named felony or misdemeanor offenses, the claimed error was unlikely to have guided the jury to an incorrect verdict in light of the evidence and arguments advanced in the present case.

Argued October 21, 2021—officially released May 3, 2022

*Procedural History*

Substitute information, in the first case, charging the defendant with the crimes of burglary in the first degree, criminal mischief in the first degree, and threatening in the second degree, and substitute information, in the second case, charging the defendant with the crime of attempt to commit criminal violation of a protective order, and substitute information, in the third case, charging the defendant with the crime of criminal violation of a protective order, and substitute information, in the fourth case, charging the defendant with the crime of tampering with a witness, brought to the Superior Court in the judicial district of Ansonia-Milford and tried to the jury before *McShane, J.*; verdicts and judgments of guilty, from which the defendant appealed to this court. *Affirmed.*

*Julia K. Conlin*, assigned counsel, with whom were *James Sexton*, assigned counsel, and, on the brief, *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, was *Margaret E. Kelley*, state's attorney, for the appellee (state).

*Opinion*

SUAREZ, J. The defendant, Kyle A., appeals from the judgments of conviction, rendered following a jury trial, of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1), criminal mischief in the first degree in violation of General Statutes § 53a-115 (a) (1), threatening in the second degree in violation of General Statutes § 53a-62 (a) (2) (A), criminal violation of a protective order in violation of General Statutes § 53a-223, tampering with a witness in violation of General Statutes § 53a-151, and attempt to commit criminal violation of a protective order in violation of General Statutes §§ 53a-49 and 53a-223.[1] The defendant's appellate claims pertain solely to his burglary conviction. The defendant claims that, because the state did not present sufficient evidence that he committed the burglary offense, he is entitled to a judgment of acquittal with respect to that offense. Alternatively, the defendant claims that, because the court's instruction concerning the burglary offense constituted plain error, the conviction for burglary should be overturned and the case remanded for a new trial with respect to that offense. We affirm the judgments of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On August 28, 2016, A resided with his daughter, who was eight years old, in a single-family residence in West Haven. A's girlfriend, T, frequently visited him at the home. The home was owned by J, who is the mother of A and his brother, who is the defendant. J did not reside in the home at that time.

The defendant had been living in Maryland, but as of August 28, 2016, he made plans to move to Connecticut and live with his brother, A, at the West Haven home. The defendant called A at approximately 6 a.m. on August 28, 2016. During the call, the defendant gave A reason to immediately become concerned about his pending arrival. On the basis of statements made by the defendant, A believed that the defendant had been consuming alcohol and "partying . . . ." At one point in the conversation, the defendant asked A if he could provide him with "Adderall or something to help keep him awake." A warned the defendant that he could not come to the home if he was intoxicated because his daughter was at the home with him. A stated, "please [do] not show up if you're drinking or anything . . . ." A also told the defendant that if he came to the home while intoxicated "that we probably couldn't let you in because my daughter was there." Initially, the defendant was upset with these restrictions, but after he spoke with A further, he asked A for time "to sober up and everything and do what I have to do." A agreed that he would talk to the defendant later that day.

At approximately 9 a.m., the defendant called A a

second time. A asked the defendant if he was doing any better and again cautioned the defendant to "just please wear it off before you make any efforts or steps to come to the house." Once again, A asked the defendant not to come to the home in light of the defendant's condition or state of mind, and emphasized that, under the circumstances, the defendant could not come in contact with A's daughter. A offered to help the defendant, at a different location, but the defendant hung up on him. At approximately 1 p.m., the defendant called A a third time. He made it clear that he was coming to the house regardless of A's objections. Once more, A asked the defendant not to come if he was intoxicated and stressed that, because a child resided at the home, the defendant had to be sober. The defendant, upset with the restrictions being placed on him by A, sent A a text message that stated, "Do you want to play with fire, you are going to get burned."

Later that day, while A and T were inside of the home, the defendant arrived. The defendant, who did not have a key to the home, angrily banged on the front door, which was locked. The defendant was screaming and yelling. The defendant went to a locked back door, broke a window on the door, and entered the home. A and T, fearing for their safety, fled from the home by means of the front door. As he left the home, A saw the defendant entering and asked him to "please stop, stop . . . ."

After they exited the home, A and T stayed a safe distance away, while seeking the aid of neighbors and attempting to contact the police. The defendant, brandishing a wooden baseball bat, emerged from the home and began to strike A's automobile, which was parked in the driveway, with the bat. The defendant used the bat to cause significant damage to property inside of the home as well. The police arrived on the scene a short time later, at which point the defendant was inside of the home. The defendant exited the home when the police instructed him to do so and, while he was being taken into custody, he noticed A standing nearby and stated that he "was going to kill [him] when [he] get[s] out of this . . . ." Hours later, while in police custody at the police department and undergoing the booking process, the defendant repeated his threat to kill A.

Following the defendant's arrest, but prior to trial, the court issued three separate protective orders that, among other things, prohibited the defendant from having contact with A and A's daughter. The orders stated, "Do not contact the protected person in any manner, including by written, electronic or telephone contact, and do not contact the protected person's home, workplace or others with whom the contact would be likely to cause annoyance or alarm to the protected person." While he was bound by this provision, the defendant called A from prison on nine separate occasions. Also,

on several occasions, the defendant mailed letters from prison to several persons in an attempt to persuade A not to cooperate with the prosecution of the charges related to his conduct on August 28, 2016, and the charges that related to his violation of a protective order. Additional facts will be set forth as necessary.

## I

First, the defendant claims that because the state did not present sufficient evidence that he committed the burglary offense, he is entitled to a judgment of acquittal with respect to that offense.[2] We disagree.

The present claim consists of two subclaims. First, relying on evidence that J, who owned the home, granted him permission to reside at the home, the defendant argues that the state's theory of the case, that he entered or remained unlawfully in the home on August 28, 2016, was not legally viable. Second, the defendant argues that the evidence was insufficient to prove beyond a reasonable doubt that he was armed with a dangerous instrument.

Before analyzing each subclaim, we set forth our standard of review and relevant legal principles. "When a criminal conviction is reviewed for the sufficiency of the evidence, we apply a well established [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Fisher*, 342 Conn. 239, 249, 269 A.3d 104 (2022).

"Our review is a fact based inquiry limited to determining whether the inferences drawn by the [fact finder] are so unreasonable as to be unjustifiable. . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt. . . .

"We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the [fact finder's] opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. . . . We are content to rely on the [fact finder's] good sense and judgment." (Internal quotation marks omitted.) *State* v. *Whitnum-Baker*, 169 Conn. App. 523, 525–26, 150 A.3d 1174 (2016), cert. denied, 324 Conn. 923, 155 A.3d 753 (2017).

Section 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when (1) such person enters or remains unlawfully in a building with intent to commit a crime therein and is armed with explosives or a deadly weapon or dangerous instrument . . . ." The state bore the burden of proving the following essential elements beyond a reasonable doubt: (1) the defendant entered or remained unlawfully in a building, (2) he did so with the intent to commit a crime therein, and (3) he was armed with a dangerous instrument. See *State* v. *Weaver*, 85 Conn. App. 329, 341–42, 857 A.2d 376 (setting forth essential elements of offense), cert. denied, 271 Conn. 942, 861 A.2d 517 (2004).

A

With respect to the first essential element of the offense, that the defendant entered or remained unlawfully in a building, the state's theory of the case was that the defendant's entry into the home was unlawful because A, who currently occupied the home, expressly forbid him from entering the home. The prosecutor argued before the jury that A was residing at the home on August 28, 2016, that the defendant was not residing at the home on that date, and that A communicated to the defendant that he was not permitted to come into the home because he was not sober. Thus, the prosecutor argued to the jury that the defendant "unlawfully entered the home where [A] was living . . . ." The prosecutor acknowledged that there was testimony from J that she had granted the defendant permission to enter the home, which she owned. The prosecutor argued, however, that the privilege to enter the home could only be granted "by the person who has [a] possessory interest in the house." The prosecutor argued that A possessed the home on August 28, 2016, and that J was residing in Florida on that date, and, thus, the permission that she may have granted the defendant was "of no moment . . . ." Moreover, the prosecutor argued that, for several reasons, J's testimony that she gave the defendant permission to enter the home was not credible in light of other evidence presented at trial.

With respect to the "unlawful entry" essential element of the offense, the court instructed the jury in relevant part: "You must . . . determine whether the

defendant unlawfully entered or remained in [a] building. A person unlawfully enter[s] or remains in a building at the time [that it] is not open to the public and the defendant is not licensed or privileged to do so. To be licensed or privileged, the defendant must either have consent from the person in possession of the building or have some right to be in that building. . . . You must determine whether the defendant unlawfully entered or remained in a building. A person unlawfully enters or remains in a building when the building, at that time, is not open to the public and the defendant is not licensed or privileged to do so. When I say not licensed or privileged to do so, I mean the defendant must either have had consent from the person in possession of the building or have some other right to be in the building." In this appeal, the defendant does not raise a claim of error related to this instruction.

During her testimony, J testified that, in August, 2016, she was not residing in the West Haven home, which she owned since 1988. She testified that, prior to and including August 28, 2016, A and his daughter were residing at the home but that the defendant had been residing with a relative in Maryland.[3] She testified, however, that she gave the defendant permission to reside at the home, that it was "our home," and that she had not placed any restrictions on his right to enter the home. J testified that the defendant has "always had a key" to the home. When asked if the defendant had a right to damage her property, J testified that she "can't answer that . . . ."

The defendant, relying on the testimony of J, asserts that, "to the extent that [he] needed an express license or privilege to be in the home, the homeowner had granted it to him, so the evidence was insufficient to establish that he entered or unlawfully remained in the house." The defendant also argues that "[he] did not 'remain unlawfully' in the house as his license to be there never was extinguished by the licensor, i.e., his mother; nor did she place any limitations on the scope of that license." The defendant asserts that the state's theory of the case was not legally viable because it rested on the flawed premise that "one can burglarize one's own residence . . . ." The defendant argues that "[w]hile [his] conduct at the home could have potentially given rise to other criminal charges, it strains the bounds of logic that [he] was charged with and convicted of burglary of his own home." The defendant argues that he neither unlawfully entered nor unlawfully remained in the home because the evidence reflects that, after he entered the home, he did not interact with anyone therein.

Although the defendant's claim is couched in terms of the sufficiency of the evidence, he purports to challenge the viability of the legal theory advanced by the state. In other words, he questions whether his conduct

in entering or remaining in the home could be unlawful in light of the evidence that the owner of the home, J, granted him permission to reside there. We conclude that the state's theory was legally viable and that the evidence sufficiently supported the jury's guilty verdict with respect to the burglary offense.

Because we must examine one of the essential elements of burglary in the third degree, related to unlawful entry and remaining in the home, we note that this issue presents an issue of law that we review under the plenary standard of review. As we stated previously, § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when (1) such person enters or remains unlawfully in a building with intent to commit a crime therein and is armed with explosives or a deadly weapon or dangerous instrument . . . ." "A person 'enters or remains unlawfully' in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so." General Statutes § 53a-100 (b).

"To enter unlawfully means to accomplish an entry by unlawful means, while to remain unlawfully means that the initial entering of the building . . . was lawful but the presence therein became unlawful because the right, privilege or license to remain was extinguished. When either of these situations is established, the threshold element of burglary is present." *State* v. *Edwards*, 10 Conn. App. 503, 511, 524 A.2d 648, cert. denied, 204 Conn. 808, 528 A.2d 1155 (1987).

"A license in real property is defined as a personal, revocable, and unassignable privilege, conferred either by writing or parol, to do one or more acts on land without possessing any interest therein. . . . Generally, a license to enter premises is revocable at any time by the licensor. . . . It is exercisable only within the scope of the consent given. . . . The term, privilege, is more general. It is a right or immunity granted as a peculiar benefit, advantage, or favor; special enjoyment of a good or exemption from an evil or burden; a peculiar or personal advantage or right esp. when enjoyed in derogation of common right; prerogative. . . . The phrase, licensed or privileged, as used in [our burglary statutes], is meant as a unitary phrase, rather than as a reference to two separate concepts." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Marsan*, 192 Conn. App. 49, 56, 216 A.3d 818, cert. denied, 333 Conn. 939, 218 A.3d 1049 (2019).

The state's theory of the case was that, on August 28, 2016, the defendant lacked a license or privilege to enter or remain in the home in which he was not a resident and which was occupied by A and his daughter. The prosecutor argued that, in the absence of any credible evidence that the defendant was licensed or privileged to enter or remain in the home, his forcible entry

into the home and his remaining in the home were, for purposes of § 53a-103 (a), unlawful. In light of the foregoing authorities, we conclude that the state's theory of the case, which focused on a lack of a license or privilege to enter and remain, was legally viable.

It cannot be disputed that the defendant's arguments concerning the license or privilege that was allegedly granted to him by the undisputed owner of the home, J, rest entirely on the credibility of J's testimony that she had granted the defendant license or privilege with respect to entering the home. The legal flaw in the defendant's argument is that he treats the challenged testimony of J as if it constituted an unassailable fact. As we have stated previously in this opinion, this court evaluates sufficiency of the evidence claims by viewing the evidence in the light most favorable to the prosecution. See *State* v. *Fisher*, supra, 342 Conn. 249. Accordingly, we presume in this case that the jury, the sole arbiter of the credibility of the witnesses, disbelieved the testimony of J to the extent that she testified that she gave the defendant a license or privilege to enter or to remain in the home. We do so mindful that the state presented ample fodder for the jury's consideration that supported a determination that J, in an attempt to assist the defendant, testified untruthfully in this regard. J's familial relationship to the defendant reasonably could have given the jury reason to consider with skepticism her testimony. We note that, contrary to J's testimony that the defendant had a key to the residence, the state presented evidence that the defendant, armed with a baseball bat, broke down a door in order to gain entry into the home on August 28, 2016. Moreover, the state presented evidence that, while he was awaiting trial, the defendant wrote letters to J in which he urged her not to cooperate with the prosecution and to create an untruthful narrative that would assist his defense, including suggesting that she inform "the judge" that he "[had] permission to be there . . . ."

The jury, having discredited the testimony of J, reasonably could have found that there was no other evidence that the defendant had a license or a privilege to enter the home or to remain in the home. Certainly, the testimony of A, which we presume the jury found persuasive, reflects that, as of August 28, 2016, the defendant was not a resident of the home, A and his daughter resided at and were the occupants of the home, and A had communicated to the defendant that he was not permitted to enter the home. The evidence also supported a finding that the defendant's conduct on his arrival at the home was that of someone who lacked a license or a privilege to enter. Specifically, the defendant did not use a key to enter the home, he did not wait for an occupant of the home to let him in, and he did not contact J, who presumably could have spoken with A to resolve any dispute concerning the defendant's arrival, for her assistance to gain entry to

the home. Rather, the evidence reflects that the defendant forcibly entered the home and caused substantial damage to the property.

In light of the foregoing, we reject the defendant's claim that the jury could not reasonably have concluded that his entry of or remaining in the home was unlawful.

B

With respect to the third element of the offense, that the defendant was armed with a dangerous instrument, the prosecutor argued that the evidence demonstrated that the defendant used a bat inside of the home after his illegal entry therein. With respect to this essential element, the prosecutor argued that the defendant used a wooden baseball bat during the commission of the offense. The defendant argues that although the evidence demonstrated that he used a baseball bat outside of the home to damage A's automobile that was parked in the driveway, the state did not present any evidence to support a finding that he was armed with a baseball bat while he was inside of the home.

General Statutes § 53a-3 (7) defines "[d]angerous instrument" in relevant part as "any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ." Although the defendant disputes that he used a wooden baseball bat inside of the home on August 28, 2016, he does not dispute that a wooden baseball bat could constitute a dangerous instrument.

We now turn to the evidence. A testified that when the defendant arrived at the home, he heard a bang on the front door and then, shortly thereafter, he heard the sound of glass breaking at the back door. A testified that, as he fled from the home by means of the front door, he saw the defendant entering the home. T, who fled the home with A as the defendant was entering through the back door, testified that while she was exiting through the front door, she heard "a bat or a kick" and "things smashing . . . ." There was photographic evidence presented that the glass on the rear door was broken, and A testified that the glass on the rear door was not broken prior to the defendant's arrival. A and T testified that, after they exited the home, they remained nearby while attempting to summon assistance. The state presented photographic evidence of damage inside of the home, including a damaged table with a ceramic or marble top in the kitchen, pieces of which were cracked and strewn about the kitchen floor, as well as a damaged television set in the living room. T testified that neither the table nor the television set were damaged prior to the defendant's entry into the home. As he was being questioned about the damage in the home, A, without objection, identified the television set in the living room as "the TV that was hit with

a baseball bat."

T testified about what she observed after she exited the home. In relevant part, she testified that as she and A were running from the home, she stopped and turned around. She saw the defendant near A's automobile, "[h]itting the car with a bat." Photographic evidence presented by the state depicted damage to multiple windows on the automobile. A testified that this damage did not exist prior to that time.[4]

As the defendant acknowledges, the state did not need to prove that the defendant was armed with a dangerous instrument on his entry into the home. It was sufficient for the state to prove that, at some point while he remained unlawfully in the home, the defendant armed himself with a dangerous instrument. See, e.g., *State* v. *Belton*, 190 Conn. 496, 505, 461 A.2d 973 (1983). The gist of the defendant's argument is that the state did not satisfy its burden of proof with respect to his being armed with a baseball bat inside of the home because there was no direct evidence of this fact, and there were no " 'proven facts' " on which the jury reasonably could have inferred this fact.

"It is axiomatic that the burden in criminal cases is on the prosecution to prove each essential element of the alleged crime beyond a reasonable doubt and that there is no burden on the defendant to prove his innocence. . . . In finding guilt beyond a reasonable doubt, a jury may not resort to speculation and conjecture but it is clearly within the province of the jury to draw reasonable, logical inferences from the facts proven." (Citations omitted.) *State* v. *Morrill*, 193 Conn. 602, 608, 478 A.2d 994 (1984). We emphasize that "the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. . . . It has been repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Sanchez*, 50 Conn. App. 145, 149, 718 A.2d 52, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998).

"The law regarding inferences . . . is clear. Due process does not . . . require that each subordinate conclusion established by or inferred from evidence, or even from other inferences, be proved beyond a reasonable doubt. We have regularly held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . . Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts. . . .

"It is axiomatic that the state's burden of proof beyond a reasonable doubt applies to each and every

element comprising the offense charged. But this burden of proof does not operate upon each of the many subsidiary, evidentiary, incidental or subordinate facts . . . upon which the prosecution may collectively rely to establish a particular element of the crime beyond a reasonable doubt. . . . Where the prosecution must rely upon circumstantial evidence, either in part or in whole, each link in the chain of circumstantial evidence need not be established beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Hersey*, 78 Conn. App. 141, 167, 826 A.2d 1183, cert. denied, 266 Conn. 903, 832 A.2d 65 (2003).

In the present case, there was direct evidence, by means of the testimony of T, of the defendant's violent use of a baseball bat in A's driveway immediately after he had illegally entered and remained in the A's home. This evidence made it more likely that the defendant possessed the baseball bat while inside of the home. It also supported a finding that the defendant, who was the only person inside of the home after A and T fled, used the baseball bat to cause the damage that was discovered inside of the home. Moreover, the photographic and testimonial evidence concerning the nature and extent of the damage to items inside of the home that were undamaged prior to the defendant's unlawful entry into the home, including damage to the kitchen table and the television set, was entirely consistent with damage that would have been caused by a baseball bat. On the basis of the evidence as a whole and the rational inferences to be drawn therefrom, the jury could have reasonably concluded beyond a reasonable doubt that the defendant either entered the home with a baseball bat or that he armed himself with a baseball bat while inside of the home.

II

Next, the defendant claims that the court's instruction concerning the burglary offense constituted plain error and that the conviction for burglary should be overturned and the case remanded for a new trial with respect to that offense. We disagree.

We begin our analysis of this claim by setting forth the relevant procedural history. The court distributed to the parties a written draft of its jury instructions and, after affording the parties a meaningful opportunity to review the instructions, held a charging conference during which defense counsel did not raise any objections to the court's burglary charge. Defense counsel submitted a written request to charge but it did not include a burglary instruction.

During closing argument, the prosecutor argued to the jury that, with respect to the second essential element of the offense, that the defendant intended to commit a crime in the home; see General Statutes § 53a-101 (a) (1); the evidence supported a finding that the

defendant acted with the requisite mental state required for the commission of the crime. The prosecutor suggested that the crime that the defendant intended to commit was criminal mischief.[5] The state charged the defendant with criminal mischief in the first degree in violation of § 53a-115 (a) (1), a felony, and in connection with this offense, it relied on evidence that he caused damage to tangible personal property inside of the home. The jury ultimately found the defendant guilty of this offense as well. In her arguments, the prosecutor also focused on the evidence of the defendant's comments concerning A, made before and after he arrived at the home. The prosecutor argued, "[i]ntent to commit a crime, the criminal mischief, crime of violence and assault, a threatening, an intent to commit a crime. The threatening threatens to commit a crime of violence with an intent to terrorize another. . . . I ask you to remember the words that were spoken by the defendant and the substance of the text messages, how could that be anything other than to terrorize . . . ."

Later, the court instructed the jury concerning the burglary offense: "The statute defining this offense reads in pertinent part as follow[s]: A person is guilty of burglary in the first degree when he unlawfully enters or remains in a building with the intent to commit a crime therein and he is armed with a dangerous instrument." After discussing the first essential element of the offense, that the defendant unlawfully entered or remained in a building, the court addressed the second element of the offense: "The second element is that the defendant unlawfully entered or remained in the building with the intent to commit a crime in that building. A person acts intentionally with respect to a result when his conscious objective is to cause such result. Even if the defendant never actually committed a crime in the building, if the evidence establishes beyond a reasonable doubt that there was such an intention, this is sufficient to prove the defendant unlawfully entered or remained in the building with the intent to commit a crime therein. Furthermore, the necessary intent to commit a crime must be an intent to commit either a felony or a misdemeanor in addition to the unlawful entering or remaining in the building." The court then addressed the third essential element of the offense, that the defendant be armed with a dangerous instrument in the building. Following the court's charge, defense counsel did not take an exception related to the burglary instruction.

The defendant, acknowledging that he failed to preserve the present claim of instructional error at trial, argues that he is entitled to relief under the plain error doctrine. "It is well known that the plain error doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved [and nonconstitutional in nature], are of such monumental propor-

tion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record. . . .

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Jones*, 210 Conn. App. 249, 271–72, 269 A.3d 870 (2022).

The gist of the defendant's argument is that the court improperly omitted a necessary portion of the instruction because, although it instructed the jury that it needed to find that the defendant acted with the specific intent to commit either a felony or a misdemeanor in the home, it failed to *identify by name* one or more specific felony or misdemeanor offenses. The defendant argues that the court deviated from the model criminal jury instruction[6] and that "[t]he court's failure to include this portion of the charge impermissibly permitted the jury to craft its own understanding of what constitutes a felony or misdemeanor, resulting in patent and readily discernible error." The defendant asserts that, in light of the evidence before the jury, "the jury could have believed any host of morally offensive behaviors, such as angrily attempting to confront his brother, to constitute a 'crime,' thereby using its own, incorrect interpretation of criminal conduct as support for the intent

element."

Because the present claim of plain error arises in the context of a claim of instructional error, we are mindful that, "[a]lthough, on rare occasions, [our Supreme Court has] granted plain error review for claims of improper jury instructions . . . [it has] done so only when the instruction in question either failed to include language from a mandatory charging statute, or when the instruction was so patently improper that to allow it to stand uncorrected would work a manifest injustice." (Citations omitted.) *State* v. *Kelly*, 256 Conn. 23, 58 n.18, 770 A.2d 908 (2001).

For several reasons, we disagree that the alleged instructional error rises to the level of plain error. First, it cannot be disputed that the alleged error does not involve the court's failure to include language from a mandatory charging statute.

Second, we are not persuaded that allowing the alleged error in the instruction to stand uncorrected would work a manifest injustice. In *State* v. *Zayas*, 195 Conn. 611, 612, 616–18, 490 A.2d 68 (1985), our Supreme Court rejected a similar claim, albeit one of constitutional magnitude, which was raised by a defendant who was convicted of attempted burglary in the second degree in violation of General Statutes (Rev. to 1979) § 53a-102 and § 53a-49. In *Zayas*, "[t]he [trial] court charged the jury that in order to convict the defendant they must find that he intended to commit a crime inside the dwelling. The court did not instruct the jury on any particular crime regarding this element of attempted burglary. The defendant argue[d] that this lack of specificity in the jury instructions deprived him of due process of law because it allowed the jury to find him guilty without necessarily finding all of the elements of attempted burglary to have been proved beyond a reasonable doubt." Id., 616. Our Supreme Court noted that it did not approve of the court's instruction and that "[t]he better practice would have been to instruct the jury on the statutory names and definitions of specific crimes for which there was sufficient evidence of an intent to commit." (Internal quotation marks omitted.) Id., 618. Nonetheless, the court rejected the defendant's constitutional challenge and concluded that it was not possible that the jury was misled because (1) the trial court instructed the jury that it must find that the defendant acted with the intent to commit a felony or a misdemeanor offense in the home that he entered unlawfully, and (2) the fact pattern, presented by the evidence, was such that it was not likely that the jury would have viewed noncriminal conduct to constitute a felony or a misdemeanor offense. Id., 617–18. The court stated: "If the fact pattern, presented by the evidence, was such that it was capable of varying interpretations, some criminal but others noncriminal though perhaps morally offensive, we would find persuasive

the defendant's assertion that, by failing to specify the crime or crimes which the evidence suggested, the court impermissibly allowed the jury to define criminal conduct. . . . But on the record before us we cannot conclude that, taken as a whole and specifically related to the facts of this case, the trial court's instructions failed to guide the jury to a clear understanding of the offense." (Citations omitted.) Id., 618.

In the present case, the defendant's attempt to demonstrate that the alleged error resulted in a manifest injustice is undermined by the fact pattern that was reflected in the evidence and expressly relied on by the prosecutor during oral argument. This fact pattern points to the defendant's intent to commit three different crimes, all of which would rise to the level required by the burglary statute. The defendant was charged with and convicted of *criminal mischief* based on his destructive conduct inside of the home. As the prosecutor stated during oral argument, there was evidence that the defendant had made *threatening* statements to A prior to his arrival at the home and after the police arrived at the scene. The jury reasonably could have viewed the defendant's statements, made in the presence of the police, in which he expressed an intent to "kill" A, combined with the evidence of the defendant's violent entry into the home and his destructive use of a baseball bat while he was inside of the home, as reflecting an intent to *assault* A. Against this factual backdrop, we do not conclude that, taken as a whole and specifically related to the facts of this case, the court's instructions did not guide the jury to a clear understanding of the offense.

Third, in light of the foregoing, the defendant has not demonstrated that the claimed error is of such monumental proportion that it threatens to erode our system of justice and result in a serious and manifest injustice. Although we do not approve of the instruction provided and note that the better practice would have been for the trial court to have instructed the jury with respect to the intent to commit one or more named felony or misdemeanor offenses, the claimed error was unlikely to have guided the jury to an incorrect verdict in light of the evidence and arguments advanced in the present case. The claimed error is not patently unjust nor does it threaten to erode our system of justice. In short, the defendant has raised an unpreserved instructional error claim that does not give rise to concerns of manifest injustice in this case, let alone concerns that affect our system of justice generally. Thus, the defendant's claim of plain error is not persuasive.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49; we decline to identify any person protected or sought to be protected under a protection order, protective

order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

[1] The trial court imposed a total effective sentence of fourteen years of imprisonment, execution suspended after nine years, followed by five years of probation.

[2] Although it is not a prerequisite to our review of this claim, we note that, at the conclusion of the state's case-in-chief, defense counsel moved for a judgment of acquittal, asserting, in general terms, that the state "failed to make out a prima facie case, warranting submission of the case to the jury." The court denied the motion. After defense counsel rested his case, he renewed the motion for a judgment of acquittal, which the court again denied.

[3] A testified that he was residing at the home with J's permission.

[4] The state also presented evidence that the police officers who responded to the scene located shards of a wooden baseball bat in various places outside of the home, including near the rear door.

[5] General Statutes § 53a-115 (a) provides in relevant part: "A person is guilty of criminal mischief in the first degree when: (1) With intent to cause damage to tangible property of another and having no reasonable ground to believe that such person has a right to do so, such person damages tangible property of another in an amount exceeding one thousand five hundred dollars . . . ."

[6] See Connecticut Criminal Jury Instructions 9.2-1, available at https://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited April 18, 2022); see also *State* v. *Gomes*, 337 Conn. 826, 853 n.19, 256 A.3d 131 (2021) (cautioning that model jury instructions are to be used as " 'guide' " and are for instructive purposes).